Alfred R. PIERCE

v.

CAPITAL CITIES COMMUNICATIONS,
INC. and Richard Kellman.

Civ. A. No. 74–1248.

United States District Court,
E. D. Pennsylvania.

Feb. 7, 1977.

Henry Thomas Dolan, Philadelphia, Pa., for plaintiff.

Elihu A. Greenhouse, Gregory M. Harvey, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

## OPINION AND ORDER

Alfred R. Pierce, formerly a Commissioner of the Delaware River Authority and the Mayor of Camden, New Jersey, has brought this diversity action against defendants Capital Cities Communications, Inc., owner and operator of television broadcasting station WPVI-TV, and Richard Kellman, a television reporter employed by WPVI-TV, for an alleged defamation which occurred on November 20, 1973 when WPVI-TV televised a special program entitled "Public Bridges and Private Riches".

Plaintiff seeks a total of four million dollars in damages, including two million for punitive damages.

Defendants have filed a motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties have submitted affidavits, briefs, a transcript of the program, a videotape of the program which was shown at oral argument and several depositions. For the reasons stated herein, the defendants' motion for Summary Judgment is granted.

In granting defendants' motion, I recognize that Alfred R. Pierce may feel that careful and accurate reporting could have given him a better and more favorable image. I also know that with the extraordinary powers of the media, their occasional failure to pursue the highest standard of accuracy has caused many honorable and responsible persons to decline any options to serve in public office because they are not willing to have their honest efforts vilified by omissions, excesses or distortions. But, this issue has been answered by the United States Supreme Court which has held that as a matter of Constitutional law a public official may not recover:

> . . . damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *New York Times v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).

By this Constitutional standard, the defendants, as to their comments on Pierce, win—but merely by a scintilla. I hope that the media will never believe that a Constitutional right which precludes them from liability is a professional justification for

sloppy reporting.[1]   Obviously, I am aware of the problem of compressing complex factual data in a flashy television news setting. But hopefully, because of its instant and extraordinary impact with its abbreviated form, reporters should pursue an even higher level of responsibility.  The defendant station's slogan "ACTION NEWS" should not become a synonym for *"partially inaccurate news."*  The public deserves a better standard with or without the station's Constitutional immunity.

## I

Mr. Pierce was appointed a commissioner of the Delaware River Port Authority by the Governor of New Jersey and served from June 4, 1962 until May 11, 1970; from 1969 until May 11, 1970 he served as Chairman of the Authority [Plaintiff's Complaint ¶ 12].  Plaintiff asserts that prior to the defendants' broadcast he ". . . was a person of good name, credit and reputation, both personally and professionally, and deservedly enjoyed the esteem and good opinion of his friends, acquaintances, business and professional associates, professional clients."  He further alleges that he ". . deservedly enjoyed the reputation of being honest, competent, upright and responsible. . . ."  [Complaint ¶ 9]

In approximately mid-August of 1973 defendant Kellman was authorized by his superior at Capital Cities, Mel Kampman, to prepare and produce a program to explore the activities of the Delaware River Port Authority and the performance of the Chairman, Ralph Cornell; this program was part of a series of news broadcasts on issues of public concern. [Kellman Deposition, pp. 23, 24 and 39].

Fourteen statements made on the WPVI–TV broadcast form the basis of the plaintiff's defamation action:

¶ 15 "When Washington crossed the Delaware River, it was absolutely free. When Action News reporter, Richard Kellman, crossed the Delaware River, it cost him sixty cents.  Washington's crossing brought us a nation.  Kell-

man's crossing brought us some incredible findings that go right into your pockets.  For 90 days now, Action News reporter, Richard Kellman has traveled the bridges of the Delaware River Port Authority and the high speed road to profit.  In a minute, Action News presents PUBLIC BRIDGES AND PRIVATE RICHES but hold onto your dollars.  After this program you may want to swim across the Delaware River".

[WPVI–TV Transcript (TR.) Larry Kane, p. 1]

¶ 18:  "The first hint of what lay ahead came in August of 1969 when the commissioners were to vote on a contract for the bridge superstructure, the steel lattice work that would support the road way of this largest cantilever highway bridge in the U. S. Bethlehem and U. S. Steel were the only bidders with Bethlehem the low bidder at forty-seven    million    dollars    .  .  . eight million above the engineers' estimate.

[Kellman (K), TR. p. 3]

"Action News obtained a copy of the Port Authority minutes of September 17, 1969.  At that meeting, a motion was made to readvertise for new bids. Voting no, were Pa. commissioners Smith, Marsh and Crisconi.  New Jersey commissioners voting no included Chairman Alfred R. Pierce and the present chairman Ralph Cornell."

[K. TR. p. 5]

¶ 20:  "Bethlehem's bid was accepted and in 1969 construction began   .  .  . Soon a fifty million dollar bridge had grown to one costing one hundred twenty   million—a   cost   difference equivalent to 120 million bridge tolls at 60 cents each.  And so  .  .  . as the toll-payers shelled out nickels, dimes and quarters to pay for the project some Port Authority commissioners saw an opportunity for enor-

---

**1.**  An example of sloppy and misleading reporting is the failure to disclose that Pierce had purchased the land in question *after* he left public office and not before.  It was also not disclosed that when Pierce purchased the land, it was public knowledge that the bridge would be built.

mous profits, profits on land deals made possible by the very bridge motorists would be paying for well in the year 2000."

[K. TR. p. 5]

¶ 22: "For years . . . corporations have been buying up farmland, jockeying for position . . . waiting for the big land rush. Among the properties with identifiable owners . . . is the 90 acre plot off Route 322 . . where the expressway linking Route 130 and 295 will be built. The deed is recorded at the Gloucester County Courthouse in Woodbury. It shows the property is owned by Alfred R. Pierce . . . former Mayor of Camden and Port Authority Chairman at the time the Barry bridge was approved."

[K. TR. p. 6]

¶ 24: "While the bridges are beautiful, they also represent a threat to the environment that mass transit doesn't. Bridges encourage auto congestion. Trains promote efficiency which is why the Port Authority is especially proud of the Lindenwold Hi Speed Line. Fully automated, the Hi Speed Line pays for its operating costs through its fares. What it doesn't pay for is the ninety-three million it costs to build. That comes from motorists using the bridges . . .

\* \* \* \* \* \*

"This is the Ferry Ave. station of the Lindenwold Hi Speed line. The ground on which I am now standing is prime commercial property. In a few years there will probably be a high rise office building here. The land is owned by a combine called ABJ, Inc. Shareholders include former Camden mayor and Port Authority Chairman Alfred R. Pierce."

[TR. K. p. 7, 8]

¶ 26: "Because of the enormous debt the Port Authority owes . . . most commissioners have vowed never again to pay for mass transit through bridge tolls. Money must come from Washington and from the two states. An expansion must come slowly . . . to the Moorestown Mall . . . the Jersey Shore . . . and to Glassboro . . . by way of Woodbury. But not all three directions at once. There must be priorities.

"A Port Authority study recommended the Gloucester route to Woodbury where there are five acres of land owned by a corporation that includes as shareholders former Camden mayor and Port Authority Chairman Alfred Pierce and former Port Authority Commissioner John Crisconi of Phila. . .

"In Mid-October, Port Authority engineers confirmed their recommendation that the Woodbury station would be built here, adjacent to the property owned in part by Pierce, Crisconi and Cornell."

[TR. K. p. 9]

¶ 28: "I think that in this kind of position where you are obviously involved completely with the public's trust you have to go out of your way to prove your honesty by all of your actions. You cannot appear to be doing something dishonest even if you yourself feel that what you are doing is honest. I certainly would say that buying land raises doubts."

[TR. Interviewee John Bunting, p. 10]

¶ 30: "On October 12, director of bridges for the Port Authority, Andrew Ferenz, was fined and given a suspended jail sentence for using Port Authority building materials on his own home.

[K., TR. p. 10]

"And Andrew Ferenz is the brother-in-law of former Camden mayor and Port Authority Chairman, Alfred R. Pierce. Is it possible that people with such inter-locking interests can truly act in the public interest?"

[K., TR. p. 11]

¶ 33: "Is it necessary to have men of such enormous power and prestige to serve as commissioners when they get involved in projects which link them with Port Authority projects and make

them look bad if the public is told about them?"

[TR. K., p. 11]

¶ 35: "By July first of next year, Gov.-elect Brendan Byrne of the state of N.J. will have six new appointments to the Delaware River Port Authority and Action News will be watching them closely and tonight we have a question. Will the background of the appointees be thoroughly checked out to avoid any possible future conflict of interest?

"Now before you take that swim across the Delaware River keep this in mind. The system of operations on the Port Authority can and might be changed. 'Public Bridges and Private Riches' can be changed to 'Public Bridges and Public Concern' if indeed the public is concerned about the operations of the Port Authority."

[TR., Larry Kane, p. 12]

## II

Plaintiff contends that these statements are defamatory and therefore actionable under Pennsylvania law. Mr. Pierce alleges that the broadcast was replete with innuendos that he used public office for personal gain. Defendants deny that the broadcast accused the plaintiff of acting in his own selfish interest and in abuse of his public trust as the holder of his office. It is contended by the defendants that ". . . the broadcast was fairly made and presented in a proper manner after careful investigation and consisted of *true facts* in a matter of public interest and general concern relating to certain transactions, some of which involved the plaintiff." Urging that summary judgment is appropriate in this case, the defendants argue that even if the innuendos are warranted under state law, the First and Fourteenth Amendments to the federal Constitution preclude plaintiff, admittedly a public figure, from maintaining this libel action unless actual malice on the part of the defendants can be shown. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In the *New York Times v. Sullivan* decision, *supra*, the Supreme Court held that the national commitment to the principle that debate on public issues should be uninhibited, robust and wide-open requires:

". . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not" *New York Times v. Sullivan, supra*; See also *Curtis Publishing v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789.

■ What Mr. Pierce must prove, therefore, is not that certain statements made by the defendant were false, but that the defendants made the statements with a "high degree of awareness of their probable falsity". *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Accord, Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 84–85, 88 S.Ct. 197, 199–200, 19 L.Ed.2d 248 (1967); *Garrison v. Louisiana*, 379 U.S. 64, 75–76, 85 S.Ct. 209, 212, 216–217, 13 L.Ed.2d 125 (1964).

But, no federal constitutional principle has been established determining which factors the trial court can consider in deciding whether the plaintiff has met his burden of proof. It is the state law which determines whether this court should look at just the transcript of the program or whether this court should consider not only what the communication states but what it suggests.

■ Under Pennsylvania law, a communication is defamatory if ". . . it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Cosgrove Studio & Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751, 753 (1962). See also, *Fram v. Yellow Cab Company of Pittsburgh*, 380 F.Supp. 1314, 1326 (W.D.Pa. 1974). Innuendos may be used to explain in what manner the communication is defama-

tory. But the innuendos must be warranted, justified and supported by the communication. Innuendos cannot be "used to introduce new matter, or to enlarge the natural meaning of the words, and thereby give to the language a construction which it will not bear." *Sellers v. Time, Inc.*, 423 F.2d 887, 890 (3rd Cir. 1970).

■ It is the function of this court to determine whether the language used in the broadcast could be fairly and reasonably construed to have the meaning imputed in the innuendos. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 273 A.2d 899 (1971); *Sarkees v. Warner-West Corporation*, 349 Pa. 365, 367, 37 A.2d 544, 546 (1944).

All parties admit that the focus of the broadcast was Ralph Cornell, Chairman of the Delaware River Port Authority when the program was aired in November of 1973. But, the plaintiff argues that the defendants threw him (Pierce) ". . . to the meat grinder for good measure" by implying that he acted dishonestly and that he used his public office for private enrichment while he was a Commissioner and Chairman of the Authority. [Pierce, Deposition B, p. 146].

■ Plaintiff contends that they accused him of impropriety and dereliction of his duty because while Chairman of the Authority he voted not to readvertise for new bids on construction of the Commodore Barry Bridge. The following sentence was found particularly offensive: "New Jersey commissioners voting no included Chairman Alfred R. Pierce and the present Chairman Ralph Cornell." This statement allegedly singles out Pierce (and Cornell). But nothing in the broadcast charges Pierce with impropriety. Pierce is not specifically named as one of the Port Authority Commissioners who saw an opportunity for enormous profits, profits on land deals made possible by the very bridge motorists would be paying for well in the year 2000 [Complaint ¶ 20]. Considering the nature of the audience reached by the broadcast (a necessary consideration under Pennsylvania law, *Boyer v. Pitt Pub. Co.*, 324 Pa. 154, 188 A. 203 (1936), it appears that a reasonable

inference would be that some of the commissioners may have profited by the vote; the innuendo that Pierce was singled out is not warranted.

It is ironic that at the time of this meeting, (September 17, 1969), plaintiff did own an interest in land which he characterized as strategically located to the completed bridge. At the time of the vote, plaintiff had not disclosed this interest to any other Commissioner. [Pierce, Deposition B, pp. 111, 116, 117–118].

The plaintiff also asserts that the innuendo that plaintiff improperly used his public office is warranted by the following statements: "The deed . . . shows the property is owned by Alfred R. Pierce" [¶ 22]; "The land is owned by a combine called ABJ, Inc. Shareholders include former Camden Mayor and Port Authority Chairman Alfred R. Pierce" [¶ 24]; and "In Mid-October, Port Authority engineers confirmed their recommendation that the Woodbury station would be built here, adjacent to the property owned in part by Pierce, Crisconi and Cornell" [¶ 26]. In sum, the defendants' broadcast reported that the plaintiff was a Commissioner of the Delaware Port Authority and was at least partial owner of land which was "strategically located" near certain Port Authority projects such as the Lindenwold High Speed Line. Although nothing in the broadcast specifically states when the plaintiff acquired these land interests, plaintiff correctly argues that under Pennsylvania law, the language in the broadcast can be fairly and reasonably construed to have the meaning imputed in the innuendos—namely, that the plaintiff obtained these interests by virtue of his public position. *Corabi v. Curtis Publishing Co., supra.*

There is a difference between what the defendants knew about Pierce's land transactions and what was stated or implied in the broadcast. It is argued by the plaintiff that proof of this disparity constitutes proof of actual malice, rendering the constitutional protection afforded defendants by the *New York Times v. Sullivan* decision inapplicable to the defendants in this case. In

support of. this contention plaintiff cites Kellman's testimony at oral deposition. When questioned about the plaintiff's purchase of land in the location of the Barry Bridge, Kellman said he was aware that ". . . the Bridge was public knowledge prior to the purchase of that property as reflected in the deeds that I discovered." [Kellman, pp. 41–43]. Kellman indicated that he was also aware that "Mr. Pierce's acquisition . . . was in 1971, . . . it was after the construction of the bridge had begun." It is uncontested by the defendants that Pierce left public office in 1970; Kellman was aware that Pierce left public office in 1970 when the broadcast was made. [Kellman 43, 45] In response to inquiries as to plaintiff's interest in land at the Ferry Avenue Station of the High Speed Line, Kellman conceded that he was aware at the time of the program that the plaintiff did not obtain this interest until after he had left public office. [Kellman, p. 53].

It is true that the program failed to reveal when Mr. Pierce purchased land situated strategically near various Port Authority projects. Such omissions render certain statements erroneous. But, as the Court said in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974), "although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate."

Plaintiff brings to this court's attention two additional statements which are allegedly defamatory. One such statement concerns Mr. Pierce's relationship to Andrew Ferenz. In October, 1973 Ferenz was fined and given a suspended jail sentence for using Port Authority building materials on his own home. During the November, 1973 broadcast, defendants referred to Ferenz as the plaintiff's brother-in-law. Ferenz is actually married to Mr. Pierce's wife's cousin. [Pierce, Dept. B, 95, 97]. While defendants admit to this error, plaintiff has produced no evidence to show that this misstatement was made with malice. Factual inaccuracies such as this are consti-

tutionally protected unless plaintiff demonstrates that the defendants were aware of the likelihood that they were disseminating false information. *St. Amant v. Thompson, supra*, 390 U.S. at 727, 88 S.Ct. at 1325.

The final statement challenged by the plaintiff is John Bunting's reply to a question posed by Kellman:

"I think that in this kind of position where you are obviously involved completely with the public's trust you have to go out of your way to prove your honesty by all your actions. You cannot appear to be doing something dishonest even if you yourself feel that what you are doing is honest. I certainly would say that buying land raises doubts."

In his deposition, Pierce described Bunting's statement as "immoral" [Pierce, Deposition B, p. 144]. However, his opinion is clearly protected by the First and Fourteenth Amendments, as the Court ruled in *Gertz v. Robert Welch, supra*:

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." 418 U.S. at 339–340, 94 S.Ct. at 3007.

It is likely that the program "Public Bridges and Private Riches" may have caused some annoyance and embarrassment to Mr. Pierce; Mr. Pierce's reputation may have been damaged by the broadcast, although no evidence of such injury appears in the record. Some of the remarks may even be characterized as "vehement", "caustic" or "unpleasantly sharp". But showing that a remark is vehement or is a "vigorous epithet" is not enough when, as here, the plaintiff is a public official; factual error, defamatory content and even resort to exaggeration and vilification are essential to free public discussion. *New York Times v. Sullivan, supra*, 376 U.S. at 272, 84 S.Ct. at 721; *Greenbelt Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).

A showing of malice may not be presumed but is a matter for proof by the plaintiff. *Time Inc. v. McLaney*, 406 F.2d 565, 572 (5th Cir. 1969). See also *Fram v. Yellow Cab Co. of Pittsburgh*, 380 F.Supp. 1314, 1335 (W.D.Pa.1974). In the instant case plaintiff has failed to demonstrate that, on the basis of pretrial affidavits, depositions, and documentary evidence, defendants acted with actual malice, the standard required by the Constitution. Plaintiff's bare allegation of malice is not sufficient to withstand a Motion for Summary Judgment. Therefore, defendants' Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure is GRANTED.