VICENTE GARCÍA CRUZ, demandante y recurrido, *v.* EL MUN-
DO, INC., ET AL., demandados y recurrentes.

*Número:* O-78-210 *Resuelto:* 20 de diciembre de 1978

176

*Rivera Cestero & Marchand Quintero,* abogados de los peticionarios; el recurrido no compareció ante el Tribunal Supremo.

EL JUEZ PRESIDENTE SEÑOR TRÍAS MONGE emitió la opinión del Tribunal.

El 22 de octubre de 1976 el periódico El Mundo publicó la siguiente noticia: "Veinte Líderes PNP en Nómina Municipio SJ Residen en Catorce Diferentes Pueblos de Isla." El reportero, Luis A. Cabán, explicó en el artículo que usó la nómina del gobierno de la capital correspondiente al 31 de diciembre de 1975 para extraer la información necesaria y que actualizó la misma al 30 de junio de 1976 por medio de fuentes confiables. El municipio de San Juan se negó en todo momento a suplir copia oficial de sus nóminas.

La noticia publicada, la que fue difundida además por las codemandadas WKAQ Radio El Mundo y WKAQ TV, Telemundo, señalaba que varios de los referidos líderes participa-

ron como candidatos en las primarias celebradas por el Partido Nuevo Progresista el 11 de julio de 1976.

El demandante recurrido, Vicente García Cruz, se postuló como candidato para el cargo de alcalde de Aguadilla en estas primarias. Fue derrotado. El artículo incluyó su nombre entre los líderes de diversos pueblos de la Isla que supuestamente recibían un sueldo del municipio de San Juan mientras estaban dedicados a sus respectivas campañas.

El 29 de octubre de 1976 el señor García Cruz demandó por la suma de un millón de dólares a El Mundo y a otras entidades y personas conectadas con esta empresa. Alegó que la información publicada era falsa en cuanto a él y que fue circulada en forma maliciosa y negligente. No se emplazó a los demandados hasta el 11 de mayo de 1977.

Los demandados interpusieron numerosas defensas, le tomaron una deposición al demandante y presentaron una moción de sentencia sumaria acompañada de una declaración jurada del codemandado Luis A. Cabán. El señor Cabán expuso en su declaración jurada que preparó su artículo luego de numerosas gestiones consistentes en conversaciones oficiales y el cotejo, análisis y comparación de documentos gubernamentales. Expresó asimismo que nunca dudó de la veracidad de los documentos estudiados o del artículo publicado finalmente y que sólo le animó el propósito de cumplir con su tarea periodística de mantener al público debidamente informado sobre asuntos oficiales. La moción de sentencia sumaria se fundó en el argumento de que el demandante estaba obligado a probar la existencia de malicia real y expresa, lo cual, conforme a alegación, no había hecho.

El demandante se opuso a esta moción, acompañando una contradeclaración jurada en la que adujo tan solo que él no era una figura pública cuando se publicó la noticia. El Tribunal Superior se negó a dictar sentencia sumaria a favor de los demandados y éstos han acudido en alzada ante nos.

Estos hechos presentan tres cuestiones básicas: ¿Era el demandante un funcionario o figura pública a los fines de las normas imperantes en este campo? De serlo, ¿qué grado de prueba exige en esta situación el concepto de malicia? Por último, ¿representa una moción de sentencia sumaria el vehículo procesal adecuado para la solución de este caso?

I

*Los conceptos de funcionario y figura públicos.*

■ *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), le añadió una nueva dimensión a la garantía constitucional de la libertad de prensa al resolver que no es difamatoria la publicación, en el ejercicio de dicha libertad, de un informe falso o de comentarios injustificados concernientes a la conducta oficial de un funcionario público, a menos que la información fuere publicada a sabiendas de que era falsa o con grave menosprecio de si era falsa o no. *Torres Silva* v. *El Mundo, Inc.*, 106 D.P.R. 415 (1977).

■ *Rosenblatt* v. *Baer*, 383 U.S. 75 (1966), y *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 (1967), extendieron la norma de *New York Times* a figuras públicas, cuando la comunidad tiene un interés justificado e importante en la materia objeto de publicación. Note, *Public Figures, Private Figures and Public Interest*, 30 Stan. L. Rev. 157, 161–162 (1977). En *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 345 (1974), se reconocieron varios tipos de figura pública: la persona que por su posición oficial, su poder o su señalado envolvimiento en los asuntos públicos ha alcanzado fama o notoriedad en la comunidad; la persona que voluntariamente participa en una contienda o controversia pública; y la persona que involuntariamente se convierte en un personaje público. Se conocen otras modalidades. Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va. L. Rev. 1349 (1975).

Véanse, para desarrollos ulteriores del concepto: *Time, Inc.* v. *Firestone*, 424 U.S. 448 (1976); Emerson, Haber & Dorsen, *Political and Civil Rights in the United States*, 4ª ed. 1976, vol. I, págs. 688–692.

■ El Tribunal Supremo de Estados Unidos ha equiparado los candidatos a cargos públicos a funcionarios públicos, hayan o no sido electos subsiguientemente. *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265 (1971); *Ocala Star-Banner Co.* v. *Damron*, 401 U.S. 295 (1971).

■ El recurrido intenta evadir la regla de *New York Times* alegando que, distinto a *Monitor Patriot* y *Ocala*, la publicación concernida se produjo tres meses después de su derrota en las primarias. No es válida la distinción. *Monitor Patriot* resolvió "como cuestión de derecho constitucional que una imputación de conducta criminal, no importa cuán remota en tiempo o lugar, jamás puede ser impertinente a la aptitud de un funcionario o candidato para ocupar un cargo público." 401 U.S. 265, 277. Aunque la conducta en cuestión no sea de orden estrictamente criminal, la derrota de un candidato a un cargo público no lo sumerge de inmediato en la categoría de persona privada. Su conducta para el tiempo de actividad pública está revestida de suficiente interés general como para retener a la persona concernida en la clasificación de figura pública, al menos por un tiempo ciertamente mayor de tres meses.

■ Esta doctrina halla amplio apoyo en la jurisprudencia. *Sas Jaworsky* v. *Padfield*, 211 So.2d 122 (La. App. 1968); *Perkins* v. *Mississippi Publishers Corporation*, 241 So.2d 139 (Miss. 1970); *Adams* v. *Frontier Broadcasting Company*, 555 P.2d 556, 560–562 (Wyo. 1976); *Pierce* v. *Capital Cities Communications, Inc.*, 427 F.Supp. 180, 2 Med. L. Rptr. 1537 (E.D. Pa. 1977) (la publicación ocurrió aquí tres años después del demandante terminar su gestión pública). Es razonable aplicar la norma de *New York Times* a la actual si-

tuación de hechos. Eaton, *op. cit.*, 1420. El demandante se lanzó voluntariamente al escenario político. Las informaciones que suplieron los medios noticiosos sobre la conducta del demandante durante el período en que aspiró al cargo de alcalde representan materia de incuestionable interés público. No es necesario pronunciarnos aquí sobre la regla aplicable cuando la noticia se refiera a la conducta estrictamente privada de una figura pública o la persona haya regresado por tan largo tiempo a la vida privada, sin interés de retornar a la palestra pública, que su derecho a la intimidad pueda concebiblemente quedar vulnerado al sopesarse los valores conflictivos envueltos. El demandante en este litigio era una figura pública al ocurrir los hechos que motivaron su demanda y estaba obligado en consecuencia a probar que la noticia se publicó a sabiendas de que era falsa o con grave menosprecio de su falsedad o certeza.

## II

*La prueba necesaria de malicia.*

■ No basta con la afirmación desnuda en una demanda de que la publicación fue maliciosa. El demandante tiene que probar la existencia de malicia real con prueba clara y convincente. *Zequeira Blanco v. El Mundo, Inc.*, 106 D.P.R. 432 (1977). La malicia real no se presume. Nuestra Ley de Libelo y Calumnia, Ley de 19 de febrero de 1902, 32 L.P.R.A. sec. 3141 y ss., ha sido modificada en este sentido por el nuevo concepto de la libertad de prensa, Art. II, Sec. 4 de la Constitución del Estado Libre Asociado de Puerto Rico y Primera Enmienda a la Constitución de Estados Unidos. *Torres Silva v. El Mundo, Inc.*, supra.

■ No puede establecerse el "grave menosprecio" a que alude la norma, a menos que la prueba sostenga una determinación de que el demandado albergaba "un alto grado de conciencia de . . . la probable falsedad." *Gertz v. Robert Welch, Inc.*, supra, 332; *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

Es imprescindible que el demandado "en efecto abrigue serias dudas sobre la certeza de la publicación." *St. Amant* v. *Thompson*, 390 U.S. 727, 731 (1968). Hill, *Defamation and Privacy under the First Amendment*, 76 Colum. L. Rev. 1205 (1976). Se ha resuelto que aun prueba de mala voluntad u odio no satisface de por sí el grado constitucionalmente requerido de la prueba de malicia. *Henry* v. *Collins*, 380 U.S. 356 (1965); *Rosenblatt* v. *Baer*, supra; Eckhardt, Jr. & McKey, *Caldero v. Tribune Publishing Co.: Substantive and Remedial Aspects of First Amendment Protection for a Reporter's Confidential Sources*, 14 Idaho L. Rev. 21 (1977). Se ha resuelto también que el "grave menosprecio" a que alude la norma "no se mide por lo que un hombre razonablemente prudente hubiese publicado o hubiese investigado antes de la publicación." Tiene que existir "prueba suficiente que permita concluir que el demandado abrigaba serias dudas sobre la certeza de la información." *St. Amant*, supra, 731; *Time, Inc.* v. *Pape*, 401 U.S. 279 (1971).

Del otro lado, la información puede ser tan inherentemente improbable que tan solo una persona temeraria pueda decidir difundirla. *St. Amant*, supra, 732. Pueden existir también razones obvias para dudar de la veracidad de la fuente. *Ibid.*

█ El demandante en este caso se limitó en la demanda y en su propia oposición a la moción de sentencia sumaria a afirmar conclusiones generales de derecho. No señaló en momento alguno los hechos en que funda sus aseveraciones de que la publicación fue maliciosa. En deposición que se le tomó en octubre de 1977 no le fue posible al demandante indicar hecho alguno demostrativo de malicia. Simplemente apuntó que lo informado no era cierto y que por lo tanto la publicación tenía que ser maliciosa.

Resta por determinar si en tales circunstancias bastaba con aseverar que la publicación tenía tal carácter y que el

demandante no era una figura pública para derrotar la moción de sentencia sumaria.

## III

*La procedencia de la sentencia sumaria.*

■ Tanto *Torres Silva* como *Zequeira Blanco* sostienen la procedencia de una sentencia sumaria cuando el demandante no demuestra la existencia de malicia real. Se ha expresado que "aunque los tribunales vacilan en dictar sentencias sumarias . . . aun así han exigido a menudo una observancia más estricta de las disposiciones de la Regla 56 (e) de las Reglas Federales de Procedimiento Civil cuando la acción envuelve los derechos de expresión de un demandado, ya que la prolongación de estos pleitos tiene un impacto disuasivo sobre el ejercicio de tales derechos." Eckhardt, Jr. & McKey, *supra*, 51; *Washington Post Co.* v. *Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966), *cert.* denegado, 385 U.S. 1011 (1967). Véase también: *Bon Air Hotel, Inc.* v. *Time, Inc.*, 426 F.2d 858, 864–65 (5th Cir. 1970). Ha llegado a resolverse que el procedimiento de sentencia sumaria es "una parte integral de la protección constitucional disponible a los demandados" en esta índole de litigio. *Cerrito* v. *Time, Inc.*, 302 F.Supp. 1071, 1075 (N.D. Cal. 1969), confirmado *per curiam*, 449 F.2d 306 (9th Cir. 1971).

■ En *Carson* v. *Allied News Co.*, 529 F.2d 206, 210 (7th Cir. 1976), se expresó que a menos que el tribunal determine, a base de declaraciones juradas, deposiciones u otra prueba documental, que la parte demandante puede probar la existencia de malicia real, en el sentido que se emplea el término en *New York Times*, debe dictarse sentencia a favor de la parte demandada. Al mismo efecto: *Fadell* v. *Minneapolis Star and Tribune Co., Inc.*, 557 F.2d 107, 2 Med. L. Rptr. 2198 (7th Cir. 1977); *Hutchinson* v. *Proxmire*, 579 F.2d 1027, 4 Med. L. Rptr. 1016 (7th Cir. 1978).

Son en extremo numerosos los casos en que se ha concedido, como en esta jurisdicción, el remedio de la sentencia sumaria en casos de libelo. Para una lista parcial en exceso de cuarenta decisiones, véase: Eckhardt, Jr. & McKey, *op. cit.*, pág. 50, n. 193.

 *New York Times Co.* v. *Sullivan*, supra, 283–92, estableció que el asunto de la suficiencia de la prueba para establecer la existencia de malicia real plantea estrictamente una cuestión de derecho. *Rosenblatt* v. *Baer*, supra, 84, 88, sentó el mismo principio en lo que respecta a la determinación de lo que constituye una figura pública. La controversia trabada en el caso presente es por tanto de naturaleza puramente jurídica. Considerados los principios expuestos, resolvemos que el demandante no podía derrotar la moción de sentencia sumaria en las particulares circunstancias de este caso con la afirmación escueta de que no era una figura pública y su aserto general de que la noticia se publicó maliciosamente.

*Se revoca la resolución recurrida y se desestima la demanda.*

El Juez Asociado Señor Rigau se une a la opinión pero se reserva el derecho a emitir un voto particular. El Juez Asociado Señor Díaz Cruz disiente en parte por los fundamentos de su disenso en *Torres Silva* v. *El Mundo, Inc.*, 106 D.P.R. 415 (1977).

—O—

Opinión concurrente del Juez Asociado Señor Rigau.

San Juan, Puerto Rico, a 9 de enero de 1979

Dice la Sentencia publicada en este caso que "El Juez Asociado Señor Rigau se une a la opinión pero se reserva el derecho a emitir un voto particular." Creo que es necesario hacer la siguiente aclaración. Cuando se circuló entre los

Jueces del Tribunal el borrador de opinión en este caso, yo voté por escrito "Conforme".

En la terminología que se utiliza en este Tribunal para expresar la posición de cada juez ante un borrador de opinión escrito y circulado por otro juez, "Conforme" es la fórmula que significa el más completo endoso y la más completa adhesión al borrador de opinión así circulado.

Un endoso más débil es "concurrir" con el resultado de la opinión. Esto se hace cuando el juez que concurre está de acuerdo con la solución del caso pero no con parte o todo de lo que en la opinión se expresa, ya sea como *ratio decidendi* o meramente como *obiter dicta*. *"Unirse"* a la opinión y escribir por separado, me parece a mí, también otra forma tibia de endosarla. Votar "Conforme" es muy distinto y significa lo que ya antes he dicho.

Como estoy de acuerdo con la opinión del Tribunal en este caso, la razón de mi expresión personal no es, desde luego, en desacuerdo con la misma, sino que es más bien una de naturaleza metodológica.

Cuando pasan por el escritorio de un juez de este Tribunal aproximadamente 30 opiniones mensuales para su estudio y decisión (incluyendo opiniones firmadas, *per curiam* y sentencias) es imposible, desde luego, estar totalmente de acuerdo con cada frase y con cada oración que esos numerosos y extensos escritos contienen. Pero si el juez está de acuerdo con la forma como se resuelve el caso y, en términos generales, con las expresiones que se hacen, da su voto a favor y guarda silencio.

Pero de vez en cuando la opinión que ante nuestros ojos pasa toca algún área o materia muy sensitiva y muy importante del Derecho, a juicio del juez que lee. Entonces dicho juez, tras angustioso debate con su conciencia, a veces llega a la conclusión de que 'debe expresarse. [1] La expresión se

---

[1] Sobre la angustia de la decisión se han expresado muchos autores. Puede verse sobre el particular el ensayo del Juez Benjamin Cardozo titulado

hace, desde luego, sin el menor menoscabo del respeto y del afecto que prevalece entre los compañeros Jueces del Tribunal. En ese espíritu paso a expresarme.

En el curso de un buen número de años, casi desde comienzos del siglo en adelante, prácticamente todos los que se han ocupado del Derecho en Puerto Rico—juristas, jueces, profesores y abogados—han venido expresando su preocupación, mediante discursos y escritos, sobre la desnaturalización y confusión de que ha sido y está siendo víctima nuestro derecho patrio. (²)

*The Growth of the Law*, Parte II y ss. ("The Need of a Philosophy of Law as an Aid to Growth") en Margaret Hall, ed. *Selected Writings of Benjamin Cardozo* (1947), pág. 195 y ss.

(²)Luis Muñoz Morales, *Reseña Histórica y Anotaciones al Código Civil de Puerto Rico*—Libro I (1947); Del mismo autor, *Compendio de Legislación Puertorriqueña y sus Precedentes* (1948); Manuel Rodríguez Ramos, *Por la Reformulación del Derecho Puertorriqueño*, 18 Rev. Jur. U.P.R. 22 (1948-49); Del mismo autor, *Breve Historia de los Códigos de Puerto Rico*, 19 Rev. Jur. U.P.R. 233 (1949-50); Luis Alberto Sánchez, *La Enseñanza del Derecho*, 20 Rev. Jur. U.P.R. 239 (1950-51); Joseph Dainow, *The Method of Legal Development Through Judicial Interpretation in Louisiana and Puerto Rico*, 22 Rev. Jur. U.P.R. 108 (1952-53); Alfonso García Martínez, *Idioma y Derecho en Puerto Rico*, 20 Rev. C. Abo. P.R. 183 (1960); José Trías Monge, *Derecho y Justicia en Puerto Rico*, 25 Rev. C. Abo. P.R. 417 (1964-65); Miro Cardona, *El Sistema Penal de Puerto Rico*, 35 Rev. Jur. U.P.R. 375, 381 (1966): *Se incurre en evidente error al importar instituciones jurídicas por perfectas que se consideren éstas en su país de origen;* Luis M. Ribo, *Observaciones sobre la Jurisprudencia en la Enseñanza del Derecho*, 20 Rev. de Derecho Puertorriqueño 335 (1966); T. B. Smith, *The Preservation of the Civilian Tradition in "Mixed Jurisdiction"*, 35 Rev. Jur. U.P.R. 263 (1966); Alfonso L. García Martínez, *Forma de las Leyes*, 26 Rev. C. Abo. P.R. 202 (1966); Díaz Asencio, *La Teoría de la Parte Realmente Interesada en la Jurisdicción Puertorriqueña*, 36 Rev. Jur. U.P.R. 87 (1967); Clara López Baralt, *Español: Idioma del Proceso Judicial*, 36 Rev. Jur. U.P.R. 393 (1967); Eduardo Vázquez Bote, *Un Caso Ejemplar de los Problemas del Derecho en Puerto Rico*, 38 Rev. de Derecho Puertorriqueño 257 (1970); Carmelo Delgado Cintrón, *Historia del Derecho Puertorriqueño*, 31 Rev. C. Abo. P.R. 157 y 283 (1970); Manuel Rodríguez Ramos, *La Equidad en el Derecho Civil (Estudio de Derecho Comparado)*, 33 Rev. C. Abo. P.R. 5 (1972); José Trías Monge, *Consideraciones sobre Nuestra Justicia*, 33 Rev. C. Abo. P.R. 57 (1972); Carmelo Delgado Cintrón, *Las Escuelas de Derecho de Puerto Rico, 1790-1961*, 41 Rev. Jur. U.P.R. 7 (1972); Alfonso García Martínez, *El Idioma y la Profesión Legal*, 34 Rev. C. Abo. P.R. 473 (1973); José Trías Monge, *Fallas de*

Creo que el caso de autos, por su importancia potencial en nuestro Derecho debió haber sido elaborado en la dirección jurídica que en discursos y en artículos hemos defendido y preconizado. La opinión del Tribunal contiene 27 citas. De ésas, dos son citas de casos de Puerto Rico y las otras veinticinco son de casos y artículos del derecho anglosajón. Si esa proporción—o desproporción—hubiese sido necesaria o inevitable no hubiese yo tenido querella con que así fuese. Después de todo, el Derecho no es un mero ejercicio jurídico operando en el vacío, pero por otro lado, el Derecho es una importante manifestación cultural y de poder que se produce y opera en una sociedad dada. Debe haber una correspondencia natural y genuina entre Derecho, sociedad y poder, en vez de una correspondencia artificial o irreal y, por ende, poco efectiva.

Sobre el tema objeto de la opinión que nos ocupa, en Puerto Rico y en el Derecho Común Civil Europeo (que no debe confundirse con el Derecho Común Angloamericano) hay también un caudal de material que bien pudo utilizarse dando así más balance, más sentido de proyección histórica y más carne de realidad a la decisión emitida. Después de todo, agotado nuestro derecho positivo y jurisprudencial en algún

*Nuestro Sistema de Justicia,* 35 Rev. C. Abo. P.R. 379 (1974); José Trías Monge, *Las Escuelas y Estudiantes de Derecho y la Reforma Judicial,* 9 Rev. Jur. Univ. Interam. 143 (1974); Eulalio A. Torres, *The Puerto Rico Penal Code of 1902–1975: A Case Study of American Legal Imperialism,* 45 Rev. Jur. U.P.R. 1 (1976); Raúl Serrano Geyls, *Los Códigos de Familia de Costa Rica y Cuba,* 45 Rev. Jur. U.P.R. 84 (1976); Carmelo Delgado Cintrón, *La Transculturación del Pensamiento Jurídico de Puerto Rico,* 45 Rev. Jur. U.P.R. 305 (1976); Marco A. Rigau, *La Formación del Abogado y Nuestro Derecho—Ética, Técnica, Idioma,* 45 Rev. Jur. U.P.R. 1 (1976); y en 38 Rev. C. Abo. P.R. 1 (1977); José Trías Monge, *La Enseñanza del Derecho y la Formación de un Derecho Propio,* 11 Rev. Jur. Univ. Interam. 771 (1977); José Ramón Vélez Torres, *La Presencia de los Sistemas de Derecho Civil y de Derecho Anglosajón en la Jurisprudencia Puertorriqueña,* 11 Rev. Jur. Univ. Interam. 805 (1977); José Trías Monge, *El Derecho en Puerto Rico,* 12 Rev. Jur. Univ. Interam. 7 (1977); Germán de Granda, *Transculturación e Interferencia Lingüística en el Puerto Rico Contemporáneo, 1898–1968* (1968).

caso, nuestro derecho común y supletorio es el derecho común civil continental europeo. Nuestro derecho no se originó con los primeros balbuceos del *Common Law* en el Siglo XII sino que se originó con el Derecho Romano que ya tenía mil años de vida cuando surge dicho *Common Law*. El Derecho Civil ya tenía más tiempo sobre la faz de la tierra cuando nace el *Common Law* que todo el tiempo que tiene el *Common Law* desde que nació hasta el presente. Son 25 siglos de vida ininterrumpida de Derecho Romano y Civil.[3] Por eso, puede decirse que sin excepción los grandes juristas angloamericanos reconocen y respetan esa larga y venerable tradición jurídica.

Así, Roscoe Pound en el Prefacio de su monumental obra *Jurisprudence,* luego de expresar que detrás de esa obra hay 70 años de estudio, dice que desea reconocer especialmente su deuda para con su profesor de Harvard John Chipman Gray quien, dice Pound, lo puso en el correcto camino al dirigirlo, al comienzo de sus estudios, al Derecho Romano.

En parecido sentido se expresa el profesor John Henry Merryman al decir que pone a uno a pensar el hecho de que cuando se publicó el *Corpus Juris Civilis* en el año 533, el Derecho Civil ya tenía una vida más larga que la que tiene el *Common Law* hoy día. Y añade que ese origen debe inspirarnos (se refiere a los juristas del *Common Law*) respeto cuando con tal monumento intelectual y moral entramos en contacto.[4]

En cuanto a nuestro derecho común propio, un distinguido jurista español se expresa como sigue: "Por muy diferentes que sean el Código español y el alemán, en sistematización y técnica, no cabe duda que ambos son derivaciones *de un mismo Derecho común,* del ius comune que impuso a Europa la Recepción del Derecho romano. Hubo un tiempo en que Europa

---

[3] Theodore Plucknett, *A Concise History of the Common Law* (1956) 294.

[4] *The Civil Law Tradition,* 4–5 (1969).

poseyó un Derecho privado común y aunque los nacionalismos lo fraccionaron en Códigos, el hecho de que el de Alemania se redactara a últimos del siglo XIX y no a principios del mismo, como sucedió con el francés, significa que la recepción en España de la literatura jurídica alemana posterior al Código tenía—para decirlo de la manera más obvia—la ventaja de cien años más de estudios. Pero, sobre todo, tenía la ventaja de que los estudios, los conceptos, los razonamientos de la literatura jurídica alemana no podían diferir, en el fondo, de lo que establecían los artículos del Código español. Por mucha que fuera la diferencia de detalle, todos los conceptos respondían a una misma simetría, la impuesta por el fondo de Derecho romano presente en todo el Derecho privado de Europa continental." (5) (Bastardillas nuestras.)

En cuanto al tema de la libre expresión, del cual el caso de autos es un corolario, tiene en nuestro país el primer rango la Sec. 4ta. del Art. II de la Constitución. La misma dispone, en lo pertinente, que "No se aprobará ley alguna que restrinja la libertad de palabra o de prensa . . . ."

En el *Informe de la Comisión de Carta de Derechos a la Convención Constituyente de Puerto Rico* se expresa que "Esta sección [la Sec. 4 de nuestra Carta de Derechos] corresponde a las restantes disposiciones de la enmienda primera en la Constitución federal e incorpora a nuestra Constitución todo el derecho históricamente establecido con relación a la libertad de palabra, de prensa, de reunión y de petición. Las secs. 3 y 4 cubren el ámbito general de la libertad de conciencia, de pensamiento, de expresión, y las actividades propias para ejercitar a plenitud dentro de la más dilatada libertad la totalidad de estos derechos." (6)

---

(5) José Puig Brutau, *La Acción Recíproca del Derecho Español y del Derecho Norteamericano en Puerto Rico*, 44 Rev. de Derecho Puertorriqueño 499, 500 (1972).

(6) *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, ed. Equity de 1961, Tomo 4, pág. 2564.

Estas palabras, hemos dicho antes, están llenas de significado, *Aponte* v. *Lugo*, 100 D.P.R. 282, 291 (1971), ese derecho histórico comprende no solamente las decisiones de los Tribunales de los Estados Unidos sino que incluye también lo mejor del pensamiento y de la tradición constitucional occidental.

La Constitución Española de 1812 expresó en su Art. 4 que "La Nación está obligada a conservar y proteger por leyes sabias y justas la libertad civil, la propiedad y los demás derechos legítimos de todos los individuos que la componen." Y en su Art. 371 dispuso que "Todos los españoles tienen libertad de escribir, imprimir y publicar sus ideas políticas sin necesidad de licencia, revisión o aprobación alguna anterior a la publicación, bajo las restricciones y responsabilidad que establezcan las leyes."

La Constitución Española de 1869 al tratar de los derechos civiles dispuso en su Art. 17 que: "Tampoco podrá ser privado ningún español: Del derecho de emitir libremente sus ideas y opiniones, ya de palabra, ya por escrito, valiéndose de la imprenta o de otro procedimiento semejante."

En Puerto Rico, además de la numerosa jurisprudencia que existe sobre el particular, parte de la cual aparece citada en *Aponte* v. *Lugo*, supra, puede verse *La Nueva Constitución de Puerto Rico*, obra publicada por la Escuela de Administración Pública de la Universidad de Puerto Rico, pág. 206 y ss. (1954). También el *Informe del Comité para el Estudio de los Derechos Civiles en Puerto Rico*, Editorial Colegio de Abogados de Puerto Rico (1959).

La vigente Constitución Española aprobada el 31 de octubre de 1978 por el parlamento bicameral español, denominado allá "Las Cortes Generales" (compuesta por una Cámara llamada Congreso de Diputados y por otra llamada el Senado) y aprobada, dicha Constitución masivamente por la Nación Española en Referéndum Nacional celebrado el 6 de diciembre del mismo año, dispone en su Art. 20, al tratar de los de-

rechos fundamentales, que se reconocen y protegen los derechos, entre otros, "a expresar y defender libremente los pensamientos, ideas y opiniones mediante la palabra, el escrito o cualquier otro medio de reproducción." También reconoce la libertad a la producción y creación literaria, artística, científica y técnica.

Abstrayéndonos por un momento del caso de autos—surge siempre la necesidad de tener alguna teoría de Derecho para producir casos que vistos después a la distancia hagan sentido, pues de lo contrario estaríamos dando palos a ciegas— conviene recordar que hacer derecho jurisprudencial requiere una labor que va más allá de tomar un número de casos compatibles de colecciones, enciclopedias y digestos y hacer un collar de cuentas monocromático. Hacer derecho jurisprudencial es una gran responsabilidad. Para comenzar, como señala don Federico De Castro y Bravo, se subvierte el orden normal constitucional y la rama que normalmente aplica el derecho se autoconvierte en soberano y se arroga la facultad de crearlo. [7] Por eso y por otras razones de no menor peso—sistema, dirección filosófica jurídica, postura frente al Derecho patrio, etc.—al hacer derecho jurisprudencial se requiere el estudio— sin demasiada prisa—del área del derecho en que se trabaja para que la decisión que se va a producir armonice con el derecho nacional con el cual va a fundirse y del cual va a formar parte. Los trasplantes, físicos o morales, son tarea artística más que mecánica.

Tiene Castán en su libro *La Formulación Judicial del Derecho*, 2da. Ed. (1954), págs. 145–146, una excelente advertencia sobre la falta de valores sistemáticos del casuismo jurídico y nos previene de que el derecho judicial, que vive de las particularidades de cada momento no lo es todo. Conviene que en Puerto Rico releamos esas páginas de Castán de vez en

---

[7] *Derecho Civil de España*, Tomo I, 554 (1955).

cuando ya que somos tan dados a formar composiciones con innumerables casos de innumerables jurisdicciones en la forma alegre e inefable que critica Wigmore. [8]

Lo que tan acertadamente se ha llamado en Puerto Rico "desconcertante mescolanza", [9] debido en gran medida a un desplazamiento por pura "acción sonámbula o avance desatendido del proceso de asimilación jurídica", [10] lo denomina don Federico de Castro y Bravo "recepción pasiva" y nos advierte del peligro que ésta encierra. Ese peligro, nos dice dicho autor, está "en el mimetismo de los que, por debilidad, moda o pereza, se entregan a la servil copia de figurines extranjeros. En la femenina actitud de estar 'al tanto' se pierde la propia personalidad; piénsese que el único modo de lograr, de verdad, y superar la gran aspiración del extranjerizante, 'estar a la altura del extranjero', es afirmarse en lo nacional." [11]

Para dar un ejemplo, la opinión del Tribunal discute el concepto de figura pública en el contexto del problema legal envuelto en el caso. Ya desde hace más de siete años este Tribunal había discutido ese concepto y lo había explicado y aplicado [12] y sin embargo la opinión no menciona el dato. Recurre a casos de otras jurisdicciones. No nos parece esta una forma muy efectiva para propiciar el crecimiento del Derecho Puertorriqueño. Debemos evitar dar la impresión, aunque ésta sea errónea, de que decimos unas cosas en nuestros discursos y escritos y hacemos otras en la práctica. Este Tribunal no solamente decide casos sino que da el ejemplo y educa; de ahí mi preocupación por estos asuntos.

---

[8] I Wigmore, *On Evidence*, 3rd Ed. (1940), Sec. 8a.

[9] José Trías Monge, *La Enseñanza del Derecho y la Formación de un Derecho Propio*, 11 Rev. Jur. U. Inter. P.R. 771, 775 (1977).

[10] José Trías Monge, *Derecho y Justicia en Puerto Rico*, 25 Rev. C. Abo. P.R. 417, 419 (1965).

[11] Obra y Tomo citados, pág. 338.

[12] Véase 100 D.P.R. 293 (1971).

Creo que si mantenemos firme la mano en el timón y fiel y correcta la dirección, podemos absorber toda la información y los usos de otras partes del mundo que nos convenga absorber pero sin perder nuestro sentido de destino y de identidad propia. El Tribunal Supremo de un país es por excelencia palacio y fragua y es el instrumento más llamado a estimular y proteger el Derecho nacional.