EL PUEBLO DE PUERTO RICO, apelado, *v.* LUIS JULIO GONZÁLEZ NAVARRETE, acusado y apelante.

Número: CR-85-35    Resuelto: 26 de junio de 1986

*José H. Martí Fajardo,* abogado del apelante; *Rafael Ortiz Carrión, Procurador General, Félix Fumero Pugliessi, Fiscal Auxiliar,* abogados de El Pueblo.

SENTENCIA

Luis Julio González Navarrete fue acusado, hallado culpable y sentenciado por el Tribunal Superior, Sala de Mayagüez, de infringir el Art. 404 de la Ley de Sustancias Controladas, 24 L.P.R.A. sec. 2404. La sentencia de dos (2) años de reclusión le fue suspendida.

Inconforme, en su apelación discute dos errores que examinaremos a continuación.

PRIMER ERROR: Erró el Hon. Tribunal de Instancia al denegar una Petición Sobre Supresión de Evidencia y admitir la droga ocupada; cuya ocupación fue producto de una intervención ilegal e irrazonable por parte de un oficial policiaco de Puerto Rico, basada dicha intervención en una querella legal en su inicio y que luego del inicio de la misma por los hechos ocurridos imposibilitan al policía de intervenir con el acusado y peticionario y mucho menos efectuar un registro en la persona de éste.

Un examen de los autos y de la exposición narrativa nos convence que el error no fue cometido. La prueba demostró un arresto y registro incidental justificado. Veamos.

El testigo José A. Ortiz Lugo declaró que mientras el 4 de octubre de 1983 caminaba a las 5:15 A.M. por la calle Bosque de Mayagüez, el conductor de una guagua blanca, tipo "Van", manifestó que le iba a caer encima y a asaltar; que en dicho vehículo iban tres personas; que sólo podía reconocer al conductor que era grueso y trigueño; que también iba otro tipo como blanco pero, que no lo podría reconocer porque estaba obscuro el interior de dicha guagua; que los otros ocupantes le dijeron palabras obscenas; que el conductor se bajó e hizo movimientos como para buscar algo dentro del vehículo; que se asustó, caminó rápido para evitar ser asaltado, apuntó la tablilla y llamó a la Policía; que al llegar el agente Jaime Muñiz le narró lo sucedido y le suministró el número de la tablilla de la guagua; que mientras le contaba este incidente, pasó nuevamente la guagua y él se lo dijo al agente; que entonces ambos se montaron en la patrulla, la siguieron y al detenerse ésta frente al Condominio El Carillón, el agente arrestó al conductor (el acusado); que al registrarlo le encontró en el "tenis" izquierdo una bolsa transparente de marihuana, y que desde que comenzó el incidente hasta que llegó el agente, transcurrieron aproximadamente como 14 minutos. El agente Muñiz corroboró esta declaración.

Estos hechos, cuya veracidad no se cuestiona, son suficientes. El propio apelante admite en su alegato que el policía Muñiz "tenía una motivación válida para intervenir con él". Su tesis, sin embargo, es que surgieron unos incidentes que paralizaron la autoridad legal del policía para seguir interviniendo, pues no le dio "motivo alguno para ello". No tiene razón.

De los hechos narrados no hay base para apoyar tal enfoque. El registro del acusado fue incidental a un arresto legal conforme la autoridad de la Regla 11 de Procedimiento Criminal. Bajo la misma un funcionario puede arrestar sin orden, cuando la persona hubiese cometido un delito grave, aunque no haya sido en su presencia, o cuando el funcionario tuviese mo-

tivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave, independientemente de que dicho delito se hubiese cometido o no en la realidad.

En *Pueblo* v. *Ortiz Martínez*, 116 D.P.R. 139, 144 (1985), aclaramos que la Policía "tiene [el deber] de investigar toda llamada telefónica e información brindada por la ciudadanía referente a posible actividad delictiva"; y que en situaciones como la de autos, es permisible un registro sin orden de la persona arrestada y del área circundante para evitar agresiones o lesiones a los agentes, fugas y lograr evidencia susceptible de ser ocultada o destruirla. Véanse además *Pueblo* v. *Rivera Rivera*, 117 D.P.R. 283 (1986) y *Pueblo* v. *Costoso Caballero*, 100 D.P.R. 147 (1971). El policía Muñiz en cumplimiento de su deber investigó, arrestó y registró al apelante González, válidamente. Tenía motivos fundados para creer que había cometido un delito grave en consideración a los antecedentes y dolos que el testigo Ortiz Lugo le había suministrado, además de la identificación de la guagua, la cual correspondía a la descripción previa y número de tablilla. Sólo transcurrió un lapso de aproximadamente 14 minutos entre la tentativa de robo y la reaparición de la guagua.

Concluimos que el registro fue razonable, incidental y contemporáneo a un arresto válido. El que no se determinara causa en la denuncia de tentativa de robo —aparentemente por la falta de interés del perjudicado— en nada afecta o altera la legalidad del arresto y registro.

## II

SEGUNDO ERROR: Erró el Hon. Tribunal de Instancia al negarse a trasladar el caso a otra sala para la celebración del juicio en su fondo de la causa criminal que pesaba contra el acusado y peticionario aún cuando existió el hecho que en una de las etapas del caso cuando se discutiera una Petición Sobre Supresión de Evidencia, dicho magistrado presidió la vista habiéndose desfilado toda la prueba ante dicho magistrado y estando el caso señalado para verse por Tribunal de Derecho

y luego de haber escuchado casi toda la prueba que desfilaría del caso el día de la celebración del juicio en su fondo.

El apelante alega violación al debido proceso de ley por el simple hecho de que ante el juez que se ventiló el caso también se discutió una moción de supresión de evidencia. Aduce que el magistrado conocía "casi toda la prueba". Se apoya en *Pueblo* v. *Toro Goyco*, 84 D.P.R. 492 (1962). No tiene razón. No cabe la analogía de *Pueblo* v. *Toro Goyco*, supra. Los hechos son claramente distinguibles del presente caso. [1]

Como dijimos en *In re Marín Báez*, 81 D.P.R. 274, 287 (1959), "nunca ha sido ni es la norma constitucional que cualquier contacto previo con la prueba, no importa su alcance y efectos, incapacite a un juzgador para dirimir posteriormente los méritos de una controversia". Esa norma general es la prevaleciente en las reglas. Así, entre los fundamentos de inhibición de la Regla 76 de Procedimiento Criminal no hallamos sostén para la teoría del apelante. Por el contrario, la Regla 234 que gobierna el trámite a seguir en torno a una moción de supresión de evidencia, contempla la posibilidad de que se dilucide conjuntamente en la vista en su fondo. Esa práctica es frecuente. "En muchas ocasiones la prueba del fiscal en oposición de las pretensiones de la defensa es la misma que tiene para sostener la acusación y el juez recibe la prueba durante la vista del caso en su fondo. Normalmente no constituye perjuicio para el acusado. Ver *Dibella* v. *United States*,

---

[1] Allí, el juez que presidió la vista de los casos en los cuales se encontró culpable a Toro Goyco fue el mismo juez que investigó los casos y ordenó la presentación de las denuncias en su contra. Bajo las disposiciones entonces vigentes resolvimos que el juez que investigaba unos hechos tenía que determinar que "se había cometido un delito y que el acusado era el presunto 'culpable'". *Pueblo* v. *Toro Goyco*, 84 D.P.R. 492, 495 (1962). Bajo esa encomienda declaramos que el juez que investigaba el caso criminal no debía ser el juzgador. Es de señalar que el grado de intervención en *Pueblo* v. *Toro Goyco*, supra, fue más activo, ya que el juez *investigó personalmente el caso* y existía "la posibilidad de que en su mente quedaran grabadas las impresiones que pudieran influir en la apreciación que hizo de la prueba el día que se ventiló el caso". *Pueblo* v. *Toro Goyco*, supra, pág. 496.

369 U.S. 121 (1962)*." Pueblo* v. *Flores Valentín,* 88 D.P.R. 913, 914 (1963). Aparte de lo expuesto, concluir lo contrario promovería la práctica incontrolable de descualificar jueces. Finalmente, ¿cómo sostener que pueda haber una infracción constitucional porque el juicio sea ventilado ante el mismo juez que separadamente declaró sin lugar la supresión, y no la haya en ocasión de plantearse la cuestión durante el proceso?

En resumen, el error no fue cometido. El apelante reclama de forma general el derecho. No aduce ni nos ha demostrado perjuicio específico alguno. Salvo que entremos en el campo de la especulación o en el fascinante laboratorio académico, el planteamiento carece de méritos.

## III

TERCER ERROR: Erró el Hon. Tribunal de Instancia en la apreciación de la prueba.

El apelante se basa en que el testigo Ortiz Lugo se contradijo, pues informó una tablilla distinta —omitió un dígito— y porque alegadamente le dijo al policía Muñiz, al detener éste la guagua, que el conductor no era quien lo trató de asaltar.

El planteamiento se reduce al valor probatorio y a la credibilidad. En el presente caso el tribunal de instancia la aquilató. Creída la prueba de cargo por el juzgador que vio y escuchó a los testigos declarar, no debemos intervenir con esa determinación salvo error manifiesto, prejuicio, parcialidad o pasión. Véase *Pueblo* v. *De Jesús Rivera,* 113 D.P.R. 817 (1983).

Se confirma la sentencia apelada.

Así lo pronunció y manda el Tribunal y certifica el Secretario General Interino. El Juez Asociado Señor Rebollo López disiente reservándose el derecho de emitir opinión al efecto en el futuro en cuanto al segundo señalamiento de error. El Juez

Asociado Señor Hernández Denton disiente sin opinión escrita. El Juez Presidente Señor Pons Núñez no intervino.

(*Fdo.*) Heriberto Pérez Ruiz
*Secretario General Interino*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

San Juan, Puerto Rico, a 31 de diciembre de 1986.

Este Tribunal se supone que resuelva un caso vía sentencia —a diferencia de una opinión firmada por uno de sus jueces y de la opinión *per curiam*— cuando "el mismo plantea cuestiones reiteradamente resueltas por este Tribunal. Una sentencia no establece norma, y menos revoca una establecida. La sentencia es la forma que utiliza el Tribunal para disponer lo más rápidamente posible del enorme número de casos que tiene que resolver. Sólo intenta resolver la controversia entre las partes". [1]

La sentencia que ha suscrito una mayoría de este Tribunal en el presente caso, [2] no obstante tratar sobre un área del derecho —contacto anterior con la prueba por el magistrado que preside el juicio— sobre la cual este Tribunal se ha manifestado en varias ocasiones en el pasado, versa sobre un tema en específico en relación con el cual este Tribunal nunca antes había tenido la oportunidad de expresarse, ésto es: *si el juez que intervino en la vista de una moción de supresión de evidencia debe o no presidir la vista en su fondo del caso.* Resulta, por tanto, curioso que no se aprovechara la oportunidad para resolver el punto mediante opinión al efecto.

---

[1] Véase voto emitido por el Honorable Juez Asociado Señor Dávila en *Figueroa Méndez* v. *Tribunal Superior,* 101 D.P.R. 859, 862 (1974).

[2] La cual fue certificada con fecha de 26 de junio de 1986.

Si bien es correcto que la decisión emitida, al ser vía sentencia, no establece precedente obligatorio para los tribunales de instancia y que en un futuro el Tribunal podría, vía opinión, establecer una norma completamente distinta, no es menos cierto que desde el punto de vista del apelante González Navarrete —cuya convicción por delito grave resulta confirmada— la decisión emitida es final, firme y obligatoria. Es por ello que de este Tribunal en el futuro "reconsiderar" la posición asumida en el presente caso, no sólo estaríamos incurriendo en una inconsistencia sino que habríamos cometido una "injusticia" con el aquí apelante. Ello es así por cuanto en un caso criminal *siempre* está en juego la libertad de un individuo y el futuro de éste y su familia. En otras palabras, el derecho que Luis Julio González Navarrete tiene a un juicio justo e imparcial no es de menor jerarquía que el de sus conciudadanos en el futuro.

La decisión emitida ciertamente causa gran preocupación. No obstante no establecer precedente obligatorio, no hay duda de que constituye un "indicador" de cómo piensan los señores jueces que componen el Tribunal y un "hecho" del cual se puede hacer una inferencia razonable de cómo, de plantearse nuevamente el asunto, resolvería el Tribunal en el futuro. La misma representa no sólo un paso de retroceso en la jurisprudencia de este Tribunal sobre esta materia en los últimos veinticinco (25) años sino un viraje repentino e inexplicable en relación con decisiones emitidas por este Tribunal en los últimos meses; viraje que resulta peligroso, no sólo porque es índice de inconsistencia, sino por lo que aparenta significar, esto es, el rechazo de garantías procesales que constituyen los cimientos del debido proceso de ley y, por ende, de un juicio justo e imparcial. Es por ello que disentimos. ([3])

---

([3]) Expresamente nos reservamos el derecho a emitir opinión disidente en el presente caso al momento en que la sentencia fue certificada.

# I

Mediante la sentencia que emite una mayoría de este Tribunal en el presente caso se rechaza expresamente el planteamiento del apelante a nivel apelativo a los efectos de que se incurrió en una violación al debido proceso de ley como consecuencia de que el juez que intervino en, y resolvió en los méritos, la moción de supresión de evidencia fue el mismo que presidió el juicio en su fondo y decretó la culpabilidad del apelante. (⁴)

Como fundamentos de dicho rechazo se aduce en la sentencia que se emite por este Tribunal, en síntesis y en lo pertinente, que de acuerdo con la jurisprudencia vigente en nuestra jurisdicción "nunca ha sido ni es la norma constitucional que cualquier contacto *previo* con la prueba, no importa su alcance y efectos, incapacite a un juzgador para dirimir posteriormente los méritos de una controversia" (énfasis suplido), citado de *In re Marín Báez*, 81 D.P.R. 274, 287 (1959); que la situación específica que presenta el caso de autos es "claramente distinguible" de los hechos del caso de *Pueblo* v. *Toro Goyco*, 84 D.P.R. 492 (1962), por cuanto el grado de intervención de un juez que determina causa probable para arresto es uno más "activo" que el de uno que interviene en una moción de supresión de evidencia; que como las Reglas de Evidencia contemplan la posibilidad de que la moción de supresión se dilucide conjuntamente en el juicio, no se justifica la determinación de que sean dos jueces los que intervengan; que decidir lo contrario "promovería la práctica incontrolable de descalificar jueces"; y que salvo "que entre-

---

(⁴) Merece destacarse que al ser llamado el caso para juicio, según ello surge de la exposición narrativa de la prueba certificada como correcta por el foro de instancia, la representación legal del apelante planteó al juez de instancia que no debía "intervenir en forma alguna y/o presidir el proceso judicial", puesto que dicho magistrado había sido el que había presidido y resuelto la moción de supresión de evidencia.

mos en el campo de la especulación o en el fascinante laboratorio académico, el planteamiento carece de méritos".

La decisión emitida —*sobre todo cuando consideramos los fundamentos aducidos*— resulta ser una verdaderamente lamentable. Somos del criterio que sólo el desconocimiento de la práctica del procedimiento criminal puede haber llevado a una mayoría de este Tribunal a semejante decisión. La misma le da la espalda, sin explicación o lógica posible, a una serie de decisiones nuestras, contemporáneas y del pasado, que proscriben que un juez que con anterioridad al juicio haya tenido una intervención activa y ostensible con la prueba pueda presidir el juicio donde se determina la culpabilidad o inocencia del acusado. Veamos.

Es correcto que en *In re Marín Baéz*, supra, pág. 287, expresamos que nunca ha sido la norma constitucional de que *cualquier* contacto previo con la prueba incapacite a un juez para actuar posteriormente en el juicio. Expresamos en ese mismo caso, sin embargo, que en "cada situación en que se alegue ese *defecto constitucional* hay que considerar *la índole del procedimiento, el grado de relación del juez con la prueba y los probables efectos de esa relación sobre su desinterés e imparcialidad*". (Énfasis suplido.)

A base de esos criterios, resolvimos en *Pueblo* v. *Toro Goyco*, supra, que un juez que determina *causa probable para arresto* no puede presidir posteriormente el juicio en su fondo. Todo aquél que haya practicado la profesión de abogado y haya acudido a un tribunal para la determinación de causa probable para arresto tiene conocimiento de que en dicha situación, por lo general, el magistrado instructor se limita a escuchar la declaración de los testigos, el acusado la mayor parte de las ocasiones no está presente, y cuando sí está presente, no está asistido de abogado por lo que no se lleva a cabo contrainterrogatorio alguno. Ese profesional con experiencia igualmente tiene conocimiento de que en una vista sobre supresión de evidencia los testigos, tanto de cargo como de de-

fensa, son extensamente interrogados y contrainterrogados, causando ello que el juez que preside la vista advenga en conocimiento total de la prueba. En adición, en la vista de supresión —dada la naturaleza, ámbito y propósito de la misma— no hay duda de que el juez "evalúa" la prueba que es presentada por ambas partes antes de emitir la decisión de si la suprime o no. Es por ello que no alcanzamos a entender el razonamiento de la mayoría de este Tribunal a los efectos de que el grado de intervención de un juez que determina causa probable para arresto es uno más "activo" que el del juez que preside una vista de supresión de evidencia. Por el contrario, si algo demuestra la experiencia y la práctica de la profesión es que el contacto con la prueba en el caso de la vista de supresión es uno mucho más extenso e impactante.

Ahora bien, lo erróneo de la decisión emitida en el presente caso todavía se hace más palpable cuando consideramos lo resuelto y expresado por este Tribunal en los casos de *Martínez Torres* v. *Amaro Pérez*, 116 D.P.R. 717 (1985) y *Pueblo* v. *Miranda Marchand*, 117 D.P.R. 303 (1986).

En el caso de *Martínez Torres* v. *Amaro Pérez*, supra, resolvimos que cuando el Estado interesa obtener una revocación sumaria de los beneficios de una sentencia suspendida que esté disfrutando *un convicto de delito grave*, éste es acreedor a una "vista sumaria inicial" donde un juez evaluará si existe causa probable para creer que ha violado las condiciones de su probatoria, decisión definitiva que tendrá que hacer en una "vista final" *un magistrado distinto* al que presidió la vista inicial. Expresamos que ello tenía que ser así debido a que en la "vista sumaria inicial" el juez "no sólo ha estado expuesto y conoce parte de la prueba, sino que la ha evaluado, y en términos de probabilidades, le ha adjudicado un valor y alcance probatorio contra el probando". Íd., pág. 732. Expresamos, por último, que este Tribunal entendía que tenían que intervenir dos magistrados distintos porque aspiraba "a lograr que nuestro sistema de administración de justicia honre al máximo

los postulados de neutralidad e imparcialidad en que se afianza". Íd., pág. 732.

Nos parece que nadie puede cuestionar seriamente el hecho de que el interés de libertad que se le reconoce a un ciudadano a quien, no obstante haber sido acusado, le cobija la presunción de inocencia es mayor que el de aquél que ya resultó convicto del delito por el cual fue acusado y se le intenta revocar una libertad a prueba. ¿Cómo es posible, entonces, que se le niegue a un acusado el derecho a que el magistrado que presida el juicio sea distinto a aquél que intervino en la supresión de evidencia cuando le concedemos a un *convicto de delito* el derecho de que las dos vistas de revocación sean presididas por jueces distintos?

Lo lamentable de la decisión emitida en el presente caso todavía resulta más patente y dramático, sin embargo, cuando consideramos la decisión emitida por este Tribunal en el caso de *Pueblo* v. *Miranda Marchand,* supra, unas semanas antes de que se emitiera la sentencia en el presente caso. Allí el juez que presidió el proceso contra el imputado de delito se reunió a solas, antes de empezar el juicio, con un compañero juez, quien resultaba ser el principal testigo de cargo. *No hubo prueba alguna en relación con el tema sobre el cual versó la conversación.*

Luego de analizar, y ratificar, nuestra jurisprudencia anterior pertinente al asunto planteado *citamos con aprobación* decisiones del Tribunal Supremo de Estados Unidos a los efectos de que:

> "*Un juicio justo en un tribunal imparcial es requisito básico del debido proceso de ley.* La justicia desde luego exige la ausencia de un verdadero prejuicio al juzgar los casos. *Pero nuestro sistema de derecho ha tratado siempre de evitar hasta la probabilidad de la injusticia.* Con este propósito ninguna persona puede ser juez en su propio caso y no se le permite a nadie juzgar casos en cuyo resultado tenga interés. Tal interés no puede definirse con precisión. Deben considerarse las circunstancias y las relaciones. *Este Tribunal ha*

*expresado, sin embargo, que 'todo procedimiento que pudiera servir de posible tentación a un hombre promedio como juez . . . a no mantener un balance preciso, claro y verdadero entre el Estado y el acusado, le niega a éste el debido proceso de ley.'* [Citas.] Una regla tan estricta puede en ocasiones impedir que actúen jueces que no están en verdad prejuiciados y quienes harían todo lo posible por mantener la balanza de la justicia en su fiel entre las partes litigantes. *Pero para desempeñar su alta función de la manera más correcta 'la justicia debe satisfacer las apariencias de la justicia.'* (Énfasis suplido)." *Tumey* v. *Ohio,* 273 U.S. 510, 532 (1927), según citado en *Pueblo* v. *Miranda Marchand,* supra, págs. 306, 307.

Expresó este Tribunal, por último, que en "el caso de autos, la realidad es que el juez que presidió el caso se reunió a solas por casi una hora con el principal testigo de cargo, un magistrado compañero suyo, sin que estuvieran presentes el acusado y sus abogados. *Independientemente de los móviles* —buena fe o ánimo de transacción— *esa reunión amerita que revoquemos y ordenemos la celebración de un nuevo juicio. Ello es un imperativo constitucional del debido procedimiento de ley*". (Énfasis nuestro.) *Pueblo* v. *Miranda Marchand,* supra, pág. 307.

Procede que nos preguntemos: ¿Si la *mera posibilidad* de que el juez adviniera en contacto con la prueba antes del juicio hace *imperativo* que éste no presida el mismo, *cuál debe ser nuestra posición cuando estamos plenamente conscientes de que con anterioridad al juicio el juez efectivamente vino en contacto pleno con dicha prueba?* La contestación resulta obvia.

Pasamos a considerar, por último, los restantes argumentos que se aducen en la sentencia emitida. Se argumenta que no se *justifica* la designación o utilización de dos jueces por razón de que la Regla 234 de Procedimiento Criminal *contempla la posibilidad* de que la moción se dilucide en el juicio ante el juez que preside el mismo. La respuesta a ello es realmente sencilla: Debe recordarse que hemos resuelto, al am-

paro de las Reglas de Procedimiento Criminal pertinentes, que, como regla general, la solicitud y vista sobre supresión de evidencia deberá hacerse y celebrarse antes del juicio pero que la solicitud, aun cuando se haya presentado y denegado previamente, *puede reproducirse* en el acto del juicio *si de la prueba de cargo surge la ilegalidad del registro* y si la defensa pone al tribunal en condiciones de resolver que las circunstancias específicas del caso ameritan o exigen que se permita reproducir la moción. *Pueblo* v. *Rivera Rivera*, 117 D.P.R. 283 (1986) ; *Pueblo* v. *Hernández Flores*, 113 D.P.R. 511, 516 (1982). Es obvio que la citada Regla 234 contempla la posibilidad de la solicitud de supresión durante el juicio *en protección adicional* de los derechos del imputado de delito y no como negativa del planteamiento aquí en controversia.

Se aduce, por último, que acoger el planteamiento del apelante "promovería la práctica incontrolable de descualificar jueces". Aparte de que en la actualidad los señores jueces de instancia, motu proprio, están refiriendo las mociones de supresión que son radicadas en los casos que tienen en sus salas a la consideración de otros compañeros jueces, es incuestionable que ante la disyuntiva de escoger entre una administración de justicia menos costosa y el derecho de un acusado a un juicio justo e imparcial, la selección es obvia. El día en que los derechos constitucionales de nuestros conciudadanos estén a expensas de consideraciones de índole económicas o administrativas será el día en que la justicia habrá dejado de constituir la razón de ser de nuestro ordenamiento jurídico.

—o—

Opinión concurrente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 8 de enero de 1987.

## I

El 26 de junio de 1986, certificamos la sentencia mayoritaria del Tribunal, en la cual se confirmaba la del Tribunal

Superior, Sala de Mayagüez, que declaró culpable al apelante Luis J. González Navarrete por infringir el Art. 404 de la Ley de Sustancias Controladas.

En aquella ocasión el Juez Asociado Señor Rebollo López disintió y se reservó el derecho de opinar en cuanto al segundo señalamiento de error, a saber, que el caso debió ventilarse en sus méritos ante juez distinto de aquél ante el cual se dilucidó sin éxito una moción de supresión de evidencia.[1] El Juez Asociado Señor Hernández Denton disintió sin opinión escrita y el Juez Presidente, Señor Pons Núñez no intervino.

Seis (6) meses después, el 31 de diciembre de 1986, el Juez Asociado Señor Rebollo López expone vehementemente, mediante Opinión Disidente, su criterio de que el segundo error fue cometido. A tal efecto, en su análisis caracteriza la sentencia mayoritaria como "un viraje repentino e inexplicable"; "viraje que resulta peligroso"; "índice de inconsistencia"; producto del "desconocimiento de la práctica del procedimiento criminal"; y que "da la espalda, sin explicación o lógica posible". Esos términos nos mueven a certificar la presente concurrencia. Al hacerlo, consignaremos los fundamentos jurídicos, recordando las sabias palabras del jurista Soto Nieto:

> ... El enjuiciamiento de los actos humanos, en toda su inmensa complejidad, requiere algo más que la frigidez mental que supone la puesta en marcha de una cadena silogística.
>
> Y tratándose de Tribunal colegiado, aún se añade a la reflexión individual la colectiva y dialogante. Qué útil y fructuoso se ofrece ese sereno contraste de pareceres, esa crítica moderada y estimulante, ese pensar conjunto desvelador de las más sutiles facetas del litigio, que la deliberación judicial promueve y facilita. Siempre que la necesaria y pacífica discusión no degenere en disputa, y que cada miembro no se crea

---

[1] Sobre esta excepcional práctica, véase la opinión *concurrente* del Juez Asociado Señor Rigau en *García Cruz* v. *El Mundo, Inc.*, 108 D.P.R. 174, 183–185 (1978).

asistido de un carisma de infalibilidad. Escuchar, escuchar con advertencia, un poco de humildad y un mucho de cortesía, las opiniones ajenas, aceptando sin demora ni regateo todo lo que tengan de fundadas y de estimables. Fuera todo ribete de soberbia intelectual capaz de impermeabilizar al Magistrado frente a ajenos veredictos, encerrándole en la concha de un exclusivismo razonante con desmedido culto al propio parecer. El que fue Subsecretario del Ministerio de Justicia, señor López Martínez, pronunció en su toma de posesión estas bellas y certeras palabras: "No escuchar es taparse los ojos y exponerse a ser dirigidos por teóricas y vanas ilusiones. No escuchar puede ser una forma de apego desordenado a los propios pareceres. Escuchar es ser atento, enterarse de lo que nos dicen y hacer un esfuerzo leal para comprender. Escuchar es incómodo porque somete a crítica nuestros planes, nos hace ver que nuestros proyectos, que nos parecían muy buenos, tienen puntos flacos o por lo menos discutibles, y nos impone el arduo trabajo de armonizar o de elegir . . . ; pero es imprescindible; sin escuchar no se debe gobernar ni el pequeño y entrañable mundo de nuestros hogares." F. Soto Nieto, *Compromiso de Justicia*, Madrid, Ed. Montecorvo, 1977, pág. 50.

En esta sintonía de coloquio edificante dirigimos nuestra atención a las preocupaciones que resultan de la disidencia. Antes no tuvimos el beneficio de conocerlas. Confiamos que estas reflexiones permitan esclarecer las interrogantes o dudas allí esbozadas, o al menos, en igualdad de condiciones, acreditar los fundamentos jurídicos básicos que apoyan nuestra posición.

## II

De entrada, merece unas breves líneas la metodología adjudicativa institucional usada. El mecanismo de sentencia es apropiado. Toda la crítica y razonamiento de la disidencia se basa en la falacia de que el planteamiento de González Navarrete era nuevo y que lo resuelto es un viraje en la doctrina prevaleciente. Bastará examinar los casos citados en la sentencia y en esta concurrencia para darnos cuenta de que dicho

planteamiento es sólo una modalidad repetitiva más, y que la misma simplemente reitera una norma jurisprudencial establecida desde hace décadas. El único cambio que detectamos es la interpretación propuesta en la disidencia.

Así, en la sentencia de 26 de junio de 1986, al analizar la cuestión expusimos:

> El apelante alega violación al debido proceso de ley por el simple hecho de que ante el juez que se ventiló el caso también se discutió una moción de supresión de evidencia. Aduce que el magistrado conocía "casi toda la prueba". Se apoya en *Pueblo* v. *Toro Goyco*, 84 D.P.R. 492 (1962). No tiene razón. No cabe la analogía de *Pueblo* v. *Toro Goyco*, supra. Los hechos son claramente distinguibles del presente caso. ([1])
>
> Como dijimos en *In re Marín Báez*, 81 D.P.R. 274, 287 (1959), "nunca ha sido ni es la norma constitucional que cualquier contacto previo con la prueba, no importa su alcance y efectos, incapacite a un juzgador para dirimir posteriormente los méritos de una controversia". Esa norma general es la prevaleciente en las reglas. Así, entre los fundamentos de inhibición de la Regla 76 de Procedimiento Criminal no hallamos sostén para la teoría del apelante. Por el contrario, la Regla 234 que gobierna el trámite a seguir en torno a una moción de supresión de evidencia, contempla la posibilidad de que se dilucide conjuntamente en la vista en su fondo. Esa práctica es frecuente. "En muchas ocasiones la prueba del fiscal en oposición de las pretensiones de la defensa es la misma que tiene para sostener la acusación y el juez recibe la prueba durante la vista del caso en su fondo. Normalmente no constituye perjuicio para el acusado. Ver *Dibella* v. *United States*, 369 U.S. 121 (1962)." *Pueblo* v. *Flores Valentín*, 88 D.P.R. 913, 914 (1963). Aparte de lo expuesto, concluir lo contrario promovería la práctica incontrolable de descualificar jueces. Finalmente, ¿cómo sostener que pueda haber una infracción constitucional porque el juicio sea ventilado ante el mismo juez que separadamente declaró sin lugar la supresión, y no la haya en ocasión de plantearse la cuestión durante el proceso?
>
> En resumen, el error no fue cometido. *El apelante reclama de forma general el derecho. No aduce ni nos ha demostrado*

*perjuicio específico alguno. Salvo que entremos en el campo de la especulación o en el fascinante laboratorio académico, el planteamiento carece de méritos.* (Énfasis nuestro.)

---

(1) Allí, el juez que presidió la vista de los casos en los cuales se encontró culpable a Toro Goyco fue el mismo juez que investigó los casos y ordenó la presentación de las denuncias en su contra. Bajo las disposiciones entonces vigentes resolvimos que el juez que investigaba unos hechos tenía que determinar que "se había cometido un delito y que el acusado era el presunto 'culpable' ". *Pueblo* v. *Toro Goyco,* 84 D.P.R. 492, 495 (1962). Bajo esa encomienda declaramos que el juez que investigaba el caso criminal no debía ser el juzgador. Es de señalar que el grado de intervención en *Pueblo* v. *Toro Goyco,* supra, fue más activo, ya que el juez *investigó personalmente el caso* y existía "la posibilidad de que en su mente quedaran grabadas las impresiones que pudieran influir en la apreciación que hizo de la prueba el día que se ventiló el caso". (Énfasis suplido.) Sentencia, pág. 580.

### III

Reafirmamos y ampliamos esos pronunciamientos. Según antes indicado, desde *In re Marín Báez,* supra; *Pueblo* v. *Quiles,* 83 D.P.R. 63 (1961); *Pueblo* v. *Pacheco,* 83 D.P.R. 285 (1961); *Pueblo* v. *Flores Valentín,* supra, y *Pueblo* v. *Martés Olán,* 103 D.P.R. 351 (1975), habíamos decidido que salvo circunstancias de comprobado perjuicio específico, no constituía error el que un mismo juez ventilara un incidente previo y a su vez posteriormente presidiera el juicio en su fondo. En *Pueblo* v. *Dones Arroyo,* 106 D.P.R. 303, 317 (1977), reiteramos enfáticamente así la norma: "El mero contacto previo con la prueba no incapacita al juez para ver el caso en los méritos. El acusado tiene que demostrar afirmativa y específicamente en qué consiste el prejuicio y parcialidad para que prospere una moción bajo la Regla 76(f). Alegaciones y conjeturas no son suficientes."

En el caso de autos, evidentemente el apelante González Navarrete no ha cumplido con esa norma. Todo su pedido está formulado en que el juez sentenciador antes le había declarado sin lugar la moción de supresión de evidencia. De ello infiere prejuicio. El razonamiento es circularmente erróneo.

Por su actualidad, reproducimos *in extenso* la cita vertida en *Pueblo* v. *Pacheco,* supra, pág. 289, del caso de *Craven* v. *United States,* 22 F.2d 605 (1927), *cert.* denegado, 276 U.S. 627, 72 L. Ed.2d 739 (1928):

"A lo sumo, pues, el affidávit imputa un 'prejuicio' fundado en la evidencia producida en corte abierta durante el primer juicio y en nada más resolvemos que tal 'prejuicio' (si es que ha de considerarse éste un término apropiado para referirse a un estado mental bien formado, 255 U.S. 42, 41 S. Ct. 236, 65 L. Ed. 481) no es personal; es judicial. Lo 'personal' contrasta con lo judicial; caracteriza una actitud de origen extrajudicial, que se produce non coram judice. El término 'personal' caracteriza claramente el prejuicio que se ha de evitar. Es la palabra significativa contenida en el estatuto. Es deber de un juez que merezca ese nombre, derivar sus puntos de vista de la evidencia. El estatuto nunca contempló inhabilitar a nuestros tribunales mediante la descalificación de un juez, sobre la base única de un prejuicio (o estado mental, 255 U.S. 42, 41 S. Ct. 236, 65 L. Ed. 481) contra violadores de la ley, civil o penal, derivada de evidencia presentada en el curso de procedimientos judiciales en que dicho juez ha entendido. *Cualquiera otra interpretación convertiría el estatuto en un escollo intolerable a una eficiente administración de los procedimientos judiciales, los cuales de por sí no son hoy día muy rápidos o efectivos.*

A base de la teoría ahora levantada, ningún juez estaría calificado para juzgar dos veces un mismo caso. No importa que el segundo juicio sea el resultado de no llegar a un acuerdo el jurado, por razones de incompetencia o aun de corrupción, o porque el juez que entendió en el caso declare con lugar una moción de nuevo juicio, o porque un tribunal de apelación sostenga un señalamiento de error. Si, como resultado del primer juicio, el juez adquiere un prejuicio o estado

mental a favor o en contra de cualquiera de las partes, como desde luego ha de ocurrir, queda descalificado.

. . . . . . . .

Si, como aconteció en muchos de los casos reportados, se permitiese que este estatuto fuera usado por abogados excesivamente celosos, que empequeñecieren su deber profesional hacia el bienestar público y hacia el tribunal en su calidad de protector del derecho público, como un método para lograr una demora (U.S. v. Fricke [D. C.] 261 F. 541), y en muchos casos un nuevo juicio ante un juez que deberá acercarse, de novo, a problemas previamente considerados por otro juez (Ex parte Am. Steel Barrel Co., 230 U.S. 35, 44, 33 S. Ct. 1007, 57 L. Ed. 1379) el estatuto habría de proveer inmunidad contra ataque únicamente a aquellos peleles amorfos que fueron condenados por el juez McReynolds por ser depositarios impropios del poder judicial (255 U.S. 43, 41 S. Ct. 236, 65 L. Ed. 481). Solamente los tímidos y los incompetentes, si es que los hay ahora o ha de haberlos en el futuro en la judicatura federal, estarían exentos de ser atacados bajo este estatuto." (Énfasis suplido.) *Pueblo* v. *Pacheco*, supra, págs. 289–290.

Esta norma prevalece. *Withrow* v. *Larkin*, 421 U.S. 35, 57 (1975); *United States* v. *Nelson*, 718 F.2d 315 (9no Cir. 1983). Es unánime la doctrina en las jurisdicciones federal y estatal respecto a que la intervención de un juez durante el procesamiento de un caso, y el conocimiento adquirido de la evidencia no impide su ulterior participación en la vista en sus méritos. 13A *Wright, Miller & Cooper, Federal Practice and Procedure* Sec. 3542 *et seq.* (2da ed. 1984). Específicamente en cuanto a la intervención en mociones de supresión de evidencia, consistentemente se ha resuelto que ello no implica prejuicio del juez. No es práctica apropiada ni favorecida solicitar su descalificación después que éste ha resuelto en contra de un acusado. *United States* v. *Parker*, 742 F.2d 127, 128–129 (4to Cir. 1984), *cert.* denegado, 105 S. Ct. 575 (1984); *United States* v. *Phillips*, 664 F.2d 971 (5to Cir.

1981), *cert.* denegado, 102 S. Ct. 2965, 103 S. Ct. 208; *People* v. *McDonald*, 186 N.E.2d 303, 306 (Ill. 1962).

El prejuicio, opinión formada o prejuzgamiento del caso que contempla el inciso (f) de la Regla 76 de Procedimiento Criminal, de ordinario no cubre la situación de decretos anteriores contra un acusado en procedimientos criminales. *Maret* v. *United States*, 332 F. Supp. 324 (Miss. 1971). Tiene que ser de naturaleza personal o demostrarse cabalmente una conducta del juez que sugiera, de hecho, que existe cierta fricción u hostilidad entre éste y el litigante. *United States* v. *Carmichael*, 726 F.2d 158, 160 (4to Cir. 1984); *Blizard* v. *Fielding*, 454 F. Supp. 318 (Mass. 1978), confirmado en 601 F.2d 1217 (1978).

"Debe hacerse una distinción entre una determinación judicial derivada de la prueba y de procedimientos extensos ante una corte, y la determinación que no está fundamentada en hechos producidos en corte, sino en actitudes e ideas que se originan de fuentes externas al recinto judicial. No es suficiente para descualificar a un juez demostrar que hubo prejuicio o apasionamiento en unas expresiones de derecho hechas previamente por él, en una decisión anterior contraria al litigante en el caso o en resoluciones adversas durante el litigio." (Traducción nuestra y citas omitidas.) *Maret* v. *United States*, supra, pág. 325. Nunca ha existido una regla absoluta y automática que autorice a descualificar a un juez por decretos judiciales en contra de un acusado, independientemente de que los mismos sean erróneos. *United States* v. *Winston*, 613 F.2d 221, 223 (9no Cir. 1980), expone así la doctrina. "La Sec. 455(b)(1) [equivalente al inciso (f) de nuestra Regla 76] por otro lado puede requerir la descualificación de un juez en situaciones en que el juez tenga conocimiento de hechos del caso antes del juicio, independientemente de cualquier posible prejuicio o parcialidad. Sin embargo, en tales casos la descualificación es únicamente procedente cuando la información se deriva de una fuente extrajudicial. El conocimiento obtenido

en el transcurso de una participación anterior en el mismo caso no requiere que el juez se descualifique a sí mismo. *United States* v. *Grinnell*, 384 U.S. 563, 583, 86 S. Ct. 1698, 1710, 16 L. Ed. 2d 778 (1966); *United States* v. *Carignan*, 600 F.2d 762, 763 (9no Cir. 1979); *United States* v. *Azhocar*, 581 F.2d 735, 739 (9no Cir. 1978), *cert.* denegado, 440 U.S. 907, 99 S. Ct. 1213, 59 L. Ed. 2d 454 (1979); *In re Webster*, 382 F.2d 79, 84 (9no Cir. 1967); *Lyons* v. *United States*, 325 F.2d 370, 376 (9no Cir. 1963), *cert.* denegado, 377 U.S. 969, 84 S. Ct. 1650, 12 L. Ed. 2d 738 (1964)."

## IV

Para sostener lo contrario, el disenso evoca la experiencia y práctica forense y concluye que ese contacto con la prueba automática e indefectiblemente exige la descalificación ulterior del juez. Como autoridades cita a *Martínez Torres* v. *Amaro Pérez*, 116 D.P.R. 717 (1985) y *Pueblo* v. *Miranda Marchand*, 117 D.P.R. 303 (1986). Una simple lectura de ambos casos demuestra que son claramente distinguibles. *Martínez Torres* v. *Amaro Pérez*, supra, al igual que *Pueblo* v. *Toro Goyco*, supra, versan sobre trámites —regularmente *ex parte*— de determinación de causa probable: uno para acusar de un delito a una persona y otro para revocar sumariamente una sentencia suspendida a un convicto. A su vez, *Pueblo* v. *Miranda Marchand*, supra, gira en torno al contacto con la prueba (perjudicado) en cámara, de origen extrajudicial y *ex parte*, antes de ventilarse el proceso.

A poco examinemos con detenimiento las interrogantes de la disidencia, notamos que se apuntalan frágilmente en la visión de que el proceso judicial —y todos los incidentes correlativos generados por mociones de diversas índoles, que implican conocimiento o contacto previo con la prueba por un juez— inhabilitan para presidir imparcialmente un proceso. Tal enfoque fue discutido e implícitamente rechazado por este Tribunal en la progenie de casos antes citados. Recientemente en

*Pueblo* v. *Rivera Tirado*, 117 D.P.R. 419, 443 (1986), luego de profundizar sobre la psicodinámica y génesis del proceso criminal y fallo, dijimos: "El fenómeno psicoanalítico del problema de estimar credibilidad entre el testigo y el juez puede medirse desde distintas perspectivas. Para algunos magistrados es probable que la primera impresión o el primer testigo sea determinante. Sin embargo, no es posible generalizar y concluir que evaluado el proceso integralmente, los jueces, mediante análisis sereno y criterio comparativo no puedan desprenderse de esa impresión original y entonces proceder a dirimir certeramente el alcance y veracidad de ese testigo a la luz de otros testimonios y demás prueba." Y más adelante, resolvimos que "de las vivencias aisladas individuales no nos es posible derivar razonablemente generalizaciones fundadas. Ni la ciencia de la psicología como tampoco las normas jurídicas apoyan esa tesis. No tenemos base para sostener la restrictiva visión de que la validez y corrección de dirimir credibilidad dependa exclusivamente del factor tiempo, de la memoria del juzgador *o de su primera impresión vis à vis la segunda. La psicogenética de juzgar es algo más complejo*". (Énfasis suplido.)

## V

Aclarados estos extremos, notamos que el planteamiento del apelante González Navarrete —que encuentra eco en la disidencia— se centra más bien en un trámite que es en sí una reconsideración. Ello no es favorecido en nuestra jurisdicción ni en la norteamericana. Nos explicamos. El planteamiento reproduce por vía de apelación la misma cuestión que con anterioridad ya trajo a este foro el 13 de marzo de 1985, por vía del *certiorari* O-85-146. Allí, con el disenso del Juez Asociado Señor Rebollo López, proveímos no ha lugar el 14 de marzo de 1985.

Salvo circunstancias excepcionales no presentes ahí debió terminar el asunto. En *Pueblo v. Hernández Flores,* 113 D.P.R. 511, 514, 516 (1982), expresamente resolvimos que un acusado —a quien se le ha negado antes una moción de supresión de evidencia— no tiene automáticamente derecho a "reiterar el planteamiento y exigir que se resuelva *de novo* después de su denegación con anterioridad a la vista de la causa". Como única excepción destacamos que la "defensa tiene que poner al tribunal en condiciones de resolver que las circunstancias específicas del caso ameritan o exigen que se permita reproducir la moción de supresión de prueba".

Así identificado, notamos que los tribunales tratan la cuestión como una reconsideración. Ello describe adecuada y suficientemente la naturaleza real del trámite. En estas circunstancias pretender que el contacto anterior con la prueba descualifique per se al juez de ventilar el juicio en su fondo es llevar el asunto a un extremo impermisible.

## VI

En resumen, en el caso de autos, el apelante González Navarrete ha tratado de hacer indirectamente lo que en *Pueblo v. Hernández Flores,* supra, no permitimos. Se trata de un reclamo al derecho a reconsideración, pero esta vez cuestionando la capacidad e imparcialidad del juez sentenciador. El argumento de previo contacto con la prueba es un *non sequitur* inmeritorio. Era él, y no el juez, a quien se estaba juzgando. "[N]o ha demostrado que el grado de contacto o relación previa con la prueba del juez que presidió el juicio causara erosión de la imparcialidad y objetividad que deben gobernar todo juicio justo. Ante esa realidad de hechos, y no existiendo disposición constitucional, legislativa o reglamentaria que excluya la participación del juez en ausencia de prueba específica de parcialidad o patente apariencia de la misma, no hemos de intervenir con la decisión de instancia." *Pueblo v. Martés Olán,* supra, pág. 356.

Después de todo, el "juez es un hombre viviente, y juzga con toda su alma; realiza obra no tan sólo racional, sino humana. La jurisprudencia, en sus aspectos multiformes, es a la vez una ciencia normativa y un arte práctico, que sirve para resolver las dificultades más diversas de la vida social. El arte de juzgar apela al espíritu de sutileza aliado con el espíritu geométrico, incluso en la aplicación de los principios del derecho. Aun debiendo someter sus razonamientos al rigor lógico, el juez piensa complacido, con GOETHE, que 'nada hay más ilógico que el abuso de la lógica'. Debe el juzgador dar pruebas de sagacidad, de prudencia y, sobre todo, de buen sentido". F. Gorphe, *Las Resoluciones Judiciales* (L. Alcalá-Zamora y Castillo, trad.) Buenos Aires, Eds. Jurídicas Europa-América, 1953, pág. 38.

—O—

Voto particular emitido por el Juez Asociado Señor Rebollo López.

San Juan, Puerto Rico, a 13 de enero de 1987.

Unas breves reflexiones sobre la "opinión concurrente" certificada por el Juez Asociado Antonio S. Negrón García con fecha de 8 de enero de 1987 en el caso de epígrafe; ponencia que desgraciadamente parece ser el producto de una "reacción impensada" por parte del juez asociado de mayor antigüedad de este Tribunal, la cual reacción lo lleva a incurrir en un curso de acción desafortunado nunca antes contemplado ni realizado en nuestra jurisdicción.

Las presentes expresiones ciertamente no tienen el propósito de refutar la "opinión concurrente" del Juez Negrón García. Aparte de que así hacerlo representaría incurrir en el mismo error que él ha cometido, somos del criterio que ello es innecesario. Los argumentos y señalamientos jurídicos, conforme los dictados de *nuestra* jurisprudencia, que expresáramos en la opinión disidente que certificamos el 31 de diciembre

de 1986 han quedado incólumes; no obstante tener los mismos que "enfrentarse" a *dos* ponencias en contrario. Prueba irrefutable de ello es la forma evasiva y fugaz en que el amigo Negrón discute dichos señalamientos.

El único propósito de la presente ponencia es el de señalar lo perjudicial que al mejor funcionamiento de un tribunal colegiado como el nuestro resulta el curso de acción seguido por el compañero Juez; con la esperanza de que, al así señalarlo, esta acción no se vuelva a repetir.

## I

El día 26 de junio de 1986 al certificar el Juez Negrón García la sentencia mayoritaria del Tribunal en el caso de epígrafe([1]) hizo constar —a solicitud expresa nuestra plasmada en la hoja de trámite de la ponencia por él circulada— que el "Juez Asociado Señor Rebollo López disiente reservándose el derecho de emitir opinión al efecto en el futuro en cuanto al segundo señalamiento de error"; esto es, que el juez que presidió el juicio en los méritos debió haberse inhibido de así hacerlo por razón de que ante él se había dilucidado una moción de supresión de evidencia.

De forma tal que —aparte de las conversaciones informales sostenidas a esos efectos con anterioridad al 26 de junio de 1986— *cuando menos desde ese día* se tenía pleno conocimiento de la objeción específica nuestra a la decisión mayoritaria.

Una somera lectura de la opinión disidente que certificamos el 31 de diciembre de 1986 es suficiente para que cual-

---

([1]) En el caso de las "sentencias" que emite este Tribunal, las cuales son certificadas por el Secretario, de ordinario se desconoce cuál de los señores Jueces de este Tribunal ha sido el autor de las mismas.

Hacemos referencia al Juez Negrón García como la persona que certificó la sentencia en el presente caso con fecha de 26 de junio de 1986 en vista de que él —en la primera oración de la "opinión concurrente" que ha emitido— públicamente lo reconoce.

quier persona pueda percatarse de que la misma efectivamente versa sobre el mencionado segundo señalamiento de error. Ni nada más, ni nada menos. Parece ser que existe una notable diferencia entre meramente escuchar unos argumentos y verlos luego plasmados en blanco y negro.

## II

Por otro lado, debe quedar meridianamente claro en la mente de todos que la "práctica" de un juez de este Tribunal de *reservarse el derecho* a emitir una opinión concurrente o disidente en el futuro *ni es nueva ni es de nuestra personal creación.*

Así de momento, entre otros y a manera de ejemplo, recordamos los casos de *Ocasio* v. *Díaz*, 88 D.P.R. 676, 754 (1963); *Figueroa Ferrer* v. *E.L.A.*, 107 D.P.R. 250, 285 (1978), y *García Cruz* v. *El Mundo, Inc.*, 108 D.P.R. 174, 183 (1978), donde distinguidos ex miembros de este Tribunal tales como los Honorables Pedro Pérez Pimentel, Ángel M. Martín, y Marco A. Rigau (Q.E.P.D.), respectivamente, se reservaron ese derecho.

Como podemos notar, dicha práctica viene siendo utilizada —y plenamente aceptada por el Tribunal— desde, por lo menos, hace más de veinte (20) años. Todo lo que se requiere es que el juez que desee reservarse ese derecho *así lo haga constar al momento de certificarse* la opinión o sentencia mayoritaria del Tribunal.

Lo que verdaderamente resulta inaudito y difícil de concebir es que un miembro de un tribunal colegiado como el nuestro realice lo efectuado por el amigo Negrón; esto es, certifique una sentencia mayoritaria y luego —sin haber hecho reserva de clase alguna— prepare y certifique por su cuenta una "opinión concurrente" a la misma; ello como "reacción" a la opinión disidente que otro juez emite, el cual oportuna y correctamente se había reservado el derecho a así hacerlo.

Somos del criterio que tal acción no sólo puede representar el comienzo de la anarquía en este Tribunal, sino que abre las puertas a la posibilidad de que los casos que se diluciden ante este Foro nunca tengan fin.

Por otro lado, resulta verdaderamente lamentable que el error haya sido cometido por el juez asociado de mayor antigüedad en el Tribunal, el cual se supone les brinde buen ejemplo a los otros que fueron designados en fecha posterior. No sé por qué razón me viene a la mente en estos momentos unas palabras de Monseñor José María Escrivá, fundador del *Opus Dei*, que leímos hace algún tiempo: "¡Qué lástima que quien hace cabeza no te dé ejemplo."

## III

Ello no obstante, deseamos hacer constar que coincidimos plenamente con el Juez Negrón García respecto a la *sabiduría* de las palabras del jurista Soto Nieto que surgen de la "opinión concurrente" emitida por el primero.

En la opinión disidente que certificamos el día 31 de diciembre de 1986 en *López Rodríguez* v. *Otero de Ramos*, expresamos, "[e]scuchar nunca le ha hecho daño a nadie. Por el contrario, si algo demuestra la experiencia es que el hacerlo impide que *actuemos impensada y apresuradamente*, lo que a su vez, tiende a evitar las equivocaciones; esto es, que cometamos injusticias que luego tengamos que lamentar". (Énfasis suplido.)

El problema surge cuando el que "escucha", quizás debido a no haber experimentado o sufrido unas experiencias en particular, no le presta atención a lo que pacientemente se le intenta explicar y —por el contrario y como consecuencia de ello— estima que no necesita "escuchar".

En estas circunstancias muy poco es lo que se puede hacer, excepto disentir. Resulta poco relevante, sin embargo, que ello se lleve a efecto un poco antes o un poco después. *La experien-*

*cia demuestra que, como regla general, esas personas siguen insistiendo en su error e intentando justificar el mismo.*

La presente situación ciertamente no le hace ningún bien a esta Institución, cuyo deber de proteger es obligación de todos sus miembros por igual. Sin embargo, "no hay mal que por bien no venga" se suele decir popularmente en nuestro Puerto Rico. Quizás, en el día de mañana, cuando uno de los miembros de este Tribunal "vehementemente" defienda una posición en particular, antes de proseguir adelante, verdaderamente se "escuche" al que así se expresa.

Debe mantenerse siempre presente que, después de todo, la excelencia y corrección de la decisión a emitirse y, por ende de la justicia es el único objetivo que debe animar a los integrantes de un tribunal colegiado como el nuestro. Dicho objetivo nunca puede ni debe ser "el prevalecer" por la mera satisfacción de que así sea; el precio a pagarse por ello es demasiado alto.

Debe recordarse que los seres humanos que hoy como jueces integramos el Tribunal somos pasajeros. Lo perdurable es la calidad de la justicia que día a día dispensamos.

—O—

Voto particular del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 13 de enero de 1987.

A modo de epílogo, al margen de los señalamientos de errores del apelante González Navarrete ya debidamente considerados por el Tribunal, estimamos de poco valor residual e institucional en esta etapa continuar abundando sobre los fundamentos jurídicos que apoyan la sentencia de 26 de junio de 1986.

En nuestra opinión concurrente emitida el 8 de enero de 1987, hemos cumplido la misión de juzgar objetivamente su destinatario, el apelante, y no a otros protagonistas del proceso decisiorio judicial.

Basta aclarar que la reserva expresa del derecho a opinar por un juez de este Tribunal fuera de los términos concedidos en la Regla 4(b) del Reglamento(¹) —como práctica de contadas excepciones que no contribuye a la deliberación colectiva e intercambio de ideas antes de adoptarse una decisión final— no es frase talismántica que prive a cualesquiera de sus restantes miembros del derecho implícito a consignar posterior y separadamente su criterio.

Como Tribunal colegiado, salvo las diferencias naturales intelectuales, de productividad y de enfoques, somos iguales. Ninguno de sus miembros puede atribuirse el poder de imponer el silencio a los demás. Después de todo, la "situación de magistrados en minoría y en mayoría nunca cristaliza en una línea divisoria fija y permanente . . . , sino que responde a una

---

(¹) Reza:

"Los jueces que intervengan en la decisión de un caso deberán indicar su posición dentro de diez días de circulada una ponencia como sentencia o dentro de veinte días de circulada una ponencia como opinión. Cualquier juez que desee expresar por escrito su criterio deberá notificarlo a los demás jueces dentro del término indicado y deberá circular su ponencia dentro de los treinta días siguientes. Este término podrá ser ampliado por el Tribunal, por causa justificada.

"Cuando un juez no se manifestare dentro del término de diez o veinte días —según fuere el caso— o no formulare su ponencia dentro de los treinta días a que se refiere el párrafo anterior, se podrá certificar la decisión haciéndose constar su no intervención o su expresión si la hubiere hecho.

"El párrafo anterior no aplicará a las ponencias circuladas durante los últimos 15 días del término de sesiones, en cuyo caso los términos antes prescritos comenzarán a contar desde el primer día hábil del próximo término de sesiones. En casos de ponencias circuladas durante el primer mes del término de sesiones, el término para devolver o indicar criterio será de treinta días.

"Cuando se circulare una ponencia y ésta recibiere la conformidad de todos los jueces, será certificada por el juez ponente como la decisión del Tribunal. Cuando la ponencia circulada obtuviere la conformidad de una mayoría de los jueces, el juez ponente dará aviso por escrito a los demás jueces, por lo menos veinticuatro horas antes de certificarla como decisión del Tribunal, de su propósito de así hacerlo, informando a su vez los nombres de aquellos jueces que se hubieren inhibido o no intervinieren, los que concurrieren y los que disintieren. Al certificarse una ponencia el juez ponente lo informará por escrito a los demás jueces."

situación por completo accidental y pasajera, por lo que el magistrado que hoy queda en minoría, mañana puede estar con la mayoría, y viceversa". A. Martín Del Burgo y Marchán, *La situación del magistrado ponente, disidente del criterio de la mayoría, en cuanto a la redacción de la sentencia,* 1979 Rev. Der. Proc. Iberoamericana 45, 47 (1979).